# Illinois Official Reports

## Appellate Court

---

### *Carlson v. Jerousek*, 2016 IL App (2d) 151248

---

| | |
|---|---|
| Appellate Court Caption | ROBERT CARLSON, Plaintiff-Appellant, v. JAMES JEROUSEK, Individually and as Agent and/or Employee of Olson Transportation, and ROBERT OLSON, d/b/a Midwest Motorcoach, Defendants-Appellees. |
| District & No. | Second District<br>Docket No. 2-15-1248 |
| Filed | December 15, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 14-L-264; the Hon. Diane E. Winter, Judge, presiding. |
| Judgment | Vacated and remanded. |
| Counsel on Appeal | Michael W. Rathsack and David Vander Ploeg, of Chicago, for appellant.<br><br>Melissa H. Dakich, James K. Horstman, and David H. Farina, of Cray, Huber, Horstman, Heil & VanAusdal, LLC, of Chicago, for appellees. |

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justice Jorgensen concurred in the judgment and opinion.
Justice McLaren specially concurred, with opinion.

**OPINION**

¶ 1        In this personal injury case, the defendants sought to have their expert make a copy of the entire contents of the plaintiff's five personal computers as well as the laptop provided to him by his employer for work. (This copying process is referred to as forensic imaging.) The plaintiff, Robert Carlson, refused to comply with this demand, despite being ordered to do so by the trial court, and was found in "friendly" contempt. He now appeals the contempt order, arguing that the trial court abused its discretion in ordering the forensic imaging. He also asserts that the trial court erred in denying him leave to file an affidavit stating that his employer owned his work laptop and thus he could not produce it. We find that the trial court failed to conduct the balancing test required for a request for forensic imaging. Accordingly, we reverse and remand for the trial court to conduct the proper analysis.

¶ 2                                I. BACKGROUND
¶ 3        In February 2012, Carlson began working as a senior computer analyst for Baxter Healthcare. A little less than two months later, on April 11, 2012, Carlson's vehicle was rear-ended by a bus operated by the defendants, James Jerousek, an agent or employee of Olson Transportation, and Robert Olson, doing business as Midwest Motorcoach. In April 2014, Carlson sued the defendants for personal injury, alleging that he suffered disability (including cognitive difficulties), emotional distress, disfigurement, and loss of a normal life after the collision. The defendants admitted liability but contested the extent of Carlson's damages.

¶ 4        In May 2014, the defendants served Carlson with interrogatories and requests to produce. The interrogatories asked Carlson to provide "the name, web address and user name for all blogs, online forums, and/or social networking websites that Plaintiff has belonged [to] and/or had a membership" in since the collision; his "internet/e-mail, telephone and cell phone providers; *** his internet/e-mail password[;] and all login information with address." Carlson objected on the grounds of overbreadth, undue burden, and irrelevance. However, without waiving these objections, he stated that he had Facebook and LinkedIn accounts and provided his personal web address, cell phone number, and cell phone carrier. The defendants did not move to compel any further responses to any of the interrogatories.

¶ 5        The requests to produce served on Carlson defined "document" to include not only physical documents but also electronically stored information. The requests sought emails, online posts, and communications relating to the issues in the lawsuit. There was also a "catch-all" request for any statement or communication in any form relating to those issues. Finally, Carlson was asked to identify any destroyed or deleted documents responsive to these requests. In July 2014, Carlson responded to the requests. He objected to all of them on the grounds of overbreadth, undue burden, and irrelevance. Without waiving these objections, he also responded to the requests for emails, online posts, and the like by stating

that there were no responsive items other than those "already available to the defendant[s]"; to the "catch-all" request by stating that all responsive items had already been disclosed or produced to the defendants; and to the request for destroyed or deleted documents by stating that there were no such items.

¶ 6    After exchanging correspondence, the defendants filed a motion to compel, arguing that Carlson had not produced any "electronically retrievable information," such as emails or other electronic communications. The defendants asked that Carlson be required to search his computer storage to identify responsive items. There was no request, at this point, for forensic imaging of Carlson's computers. After a hearing, the trial court granted the motion in part, ordering that, as to request Nos. 10 and 12, Carlson must "perform due diligence to recover all emails, during the relevant period, relating to issues in the complaint and must provide a privilege log if necessary," and as to request No. 11, Carlson must "perform due diligence to recover [the requested] information *** from plaintiff's social networking accounts." As to request No. 13, plaintiff was ordered to identify the responsive items he believed were already disclosed or provided to the defendants.

¶ 7    In September 2014, Carlson tendered supplemental answers. There is no record of any motion to compel Carlson to provide any further responses to this discovery.

¶ 8    Six months later, the defendants filed a motion seeking an order requiring Carlson to "retain, preserve, and protect" any "computers and/or electronic devices *** so that they [could] be inspected by the defendants." In their motion, they noted that Carlson had testified, at his deposition, that he possessed at least five such computers or devices. Asserting only that Carlson's "knowledge and/or research of such topics has been put at issue in this case," the defendants sought "the opportunity to inspect and investigate the computers and/or electronic devices in possession of [*sic*], used, owned, or operated by" Carlson since the collision. The defendants therefore asked the trial court to enter the proposed order.

¶ 9    The trial court heard this motion on March 3, 2015. The trial court ordered the retention and preservation of Carlson's computers but struck the language in the proposed order allowing the defendants to inspect the computers. It also entered a briefing schedule. The parties filed their briefs, but, for reasons not apparent from the record, on May 13, 2015, the trial court entered an order striking the defendants' motion, allowing them to refile it, and scheduling the briefing of that refiled motion.

¶ 10    The defendants filed a new motion "to compel the inspection of plaintiffs' [*sic*] computers and the disclosure of plaintiff's emails, web addresses and social media sites." In it, they argued that they should be allowed to inspect Carlson's computers because he performed his work almost entirely on computers and he was claiming that his ability to perform some of his work tasks had been damaged by the collision. Specifically, Carlson had testified at his deposition that he experienced a lack of concentration, lost focus, became fatigued, and had to lie down. The defendants were suspicious about whether these claims were overstated, noting that Carlson's supervisor, Andrea Schwartz, had testified at her deposition that Carlson was very competent at his job and was an asset to his team. In addition, Carlson had prepared a log of his symptoms on a computer. Although the log had been produced to the defendants, they argued that he had continued to update it and had not produced the updated log to them. Further, the symptoms were recorded using sophisticated language that the defendants believed Carlson might have acquired through internet searches relating to symptoms of brain injury. Accordingly, the defendants wanted to inspect

Carlson's "computer usage, research, and creation of litigation exhibits," including any stored record of his Internet searches since the collision. Without defining the term "metadata," the defendants requested the ability to "inspect the metadata on [Carlson's] computers *** to determine what work he ha[d] performed for his lawsuit, what changes, if any, he ha[d] made to the exhibits and documents he created concerning damages, what research he ha[d] conducted concerning traumatic brain injuries, how much time [Carlson] spen[t] on his computers, and what data he ha[d] recorded that he ha[d] failed to provide" to the defendants. Although they asserted that their requests were "narrowly tailored," the defendants did not propose any limitations or protections to be applied to their requested inspection. Finally, they argued that information from any online social networking sites used by Carlson was relevant to determining the extent of his injuries and thus should be produced. The defendants asked the trial court to allow them to inspect all of Carlson's computers and electronic devices and to "allow the discovery of" his presence on social media, his webpages, and his emails.

¶ 11    In response, Carlson argued that there was no basis for allowing such a wide-ranging and intrusive discovery method; the computers were not the focal point of the case, and the defendants were able to obtain information about the extent of his brain injuries in many other ways, including the written discovery already answered, multiple depositions of several witnesses who directly observed his work, and testing by the defendants' own expert witness, a neuropsychologist. In reply, the defendants argued that computerized information is, generally speaking, discoverable and that to deny their motion would prejudice them. At no point did the defendants support their motion with any affidavits or other evidence from an expert in computer technology describing the information retrievable through such an inspection or the methods that would be used to conduct the search.

¶ 12    In July 2015, the trial court heard oral argument on the defendants' motion to compel. For the first time, the defendants clearly expressed their desire to search the computer that Baxter provided to Carlson for work as well as his own computers. The defendants argued that they wanted to view metadata from Carlson's work computer in order to learn whether, since the accident, it was really taking Carlson longer to complete work tasks and whether he was really staying later at work to complete his work. The trial court asked how the computer could tell them that. The defendants' attorneys acknowledged that they themselves did not know how to use a computer to discover this information, but they asserted that a computer expert could "pull the metadata" that would "show the task[s] that [Carlson]'s working on and how long he's working on them." (Although this assertion might be correct, the record does not contain any actual evidence supporting it.) The defendants also wanted to view Carlson's own computers to determine whether he was staying up late playing computer games so that, if so, they could argue that (a) he was still able to concentrate sufficiently to play these games and (b) it was this activity, not the injuries related to the accident, that was causing him to be fatigued at work. The defendants asserted that they "were not asking for personal information," only the metadata about Carlson's use of the computers, because Carlson "ha[d] made this an issue in the case" by claiming that he was less able to perform his work, which involved using the computer.

¶ 13    Carlson pointed out the extremely broad nature of the proposed search and the relative lack of any justification for it other than the possibility that he and the other witnesses previously deposed were lying about the extent of his injuries. In response, the defendants

said that they were "in no way asserting" that Carlson was lying but that they had "a right to discover all relevant information."

¶ 14    The trial court initially expressed skepticism, noting that, although Carlson's use of computers was potentially relevant because he used computers in his work and for relaxation, the same thing was potentially true of "every plaintiff in every case." As to any inspection of Carlson's work computer, that was "a no start right there" because Baxter would certainly object. As to Carlson's own computers, there were many other ways to get similar information without the defendants combing through those computers: for instance, information about the extent of Carlson's computer gaming and even his game scores over time could be obtained through directed subpoenas to the operators of the online games he played. Such narrowly tailored searches would be preferable to allowing the defendants to "rifle though the plaintiff's mail every day to pick out what you like." The defendants suggested that perhaps they could draft a protective order that would identify the narrow information they sought. The trial court indicated that it was open to such an approach but that it would have to see the draft order and that it would be cautious because "people put their whole lives on a computer, and that's not acceptable for the defense to be able to search through their entire life." In addition, the trial court would need expert input about exactly what information could and would be retrieved. The trial court therefore continued the motion to compel.

¶ 15    On September 23, 2015, the motion to compel the inspection of the computers again came before the trial court. After hearing other discovery disputes and admonishing the parties for not treating each other in a civil or professional manner, the trial court turned to the motion. The defendants stated that they had drafted a protective order and had sent it to Carlson, but Carlson would not agree to it. They tendered the draft to the trial court, characterizing it as providing that any data pulled from the computers would be given to Carlson's attorney first, so that privileged material could be identified and a privilege log could be prepared.

¶ 16    In fact, the draft protective order provided that an expert (presumably retained by the defendants, although this point was not specifically addressed) would make a mirror copy (forensic image) of the entire contents of all of the hard drives on all of Carlson's personal computers and the computer he used for work. (Although Carlson's attorney or another designated representative could be present during the forensic imaging process, the utility of this as a safeguard is dubious, as the order did not allow the representative any input into the imaging process.) The defendants' expert would then search all of the hard drives, "looking for evidence of the existence of information relating to issues in this lawsuit, including: [1] Time stamps indicating duration of computer usage at work or for work purposes; [2] Time stamps indicating duration of usage for purposes of using computer games; [3] Search terms with respect to head trauma, traumatic brain injury, icepick headaches, memory loss, unbalanced IQ, fatigue, personality disorders, hand tremors, sleep apnea, and lack of concentration; [and] [4] Documents created by Plaintiff with respect to his symptoms and/or research regarding the search terms contained in subparagraph 3." The defendants' expert would catalogue the results of this search in a report of findings and would also prepare an executive summary of the findings. The expert would file both of these in their entirety with the trial court, although only the executive summary would be public; the findings themselves would be filed under seal. The expert would also serve a copy of the findings on

Carlson's attorney, who would have 10 business days to redact any privileged material and prepare a privilege log. Carlson's attorney would then serve the redacted findings and the privilege log on the defendants' counsel. Any "data" claimed to be subject to the attorney-client privilege would be treated as confidential information, which the defendants' expert would not reveal to or discuss with the defendants' counsel. (No mention was made of any other potentially applicable privileges.) The protective order also included a clawback provision pursuant to which the disclosure of such confidential information would not be deemed a waiver and counsel would cooperate to "restore the confidentiality" of any confidential information inadvertently disclosed. However, any other "relevant, non-confidential information derived from the inspection" could be used in any later hearing, motions, or at the trial of the action.

¶ 17     The defendants also represented to the trial court that they "now had testimony" that the work computer used by Carlson (a laptop which he was permitted to and frequently did take home) was "leased by him" and thus was within his control and should be produced by him. (The defendants did not identify the testimony they were referring to, and no such testimony appears in any of the depositions filed as exhibits.) Carlson disputed this, saying that the laptop was Baxter's and that the defendants needed to "get Baxter in here" (*i.e.*, subpoena Baxter) in order to gain access to that computer. The trial court responded with irritation, asking Carlson's attorney why *he* had not brought Baxter into the proceedings on the motion to compel, saying that "[t]his is the attitude I am talking about" and that the parties should not be pointing to each other as the one responsible for taking action to move the case forward. Despite commenting that it seemed strange that Baxter would lease work computers to its employees, the trial court apparently accepted the defendants' representation that this was the case. It entered an order requiring the forensic imaging of the computers, including the work computer, and also entered the protective order drafted by the defendants, saying that it would "leave it to Baxter to come in and tell us why" Carlson's work computer should not be produced.

¶ 18     Carlson forwarded a copy of the trial court's order to his supervisor at Baxter. On October 6, 2015, Sarah Padgitt, senior litigation counsel at Baxter, wrote Carlson to tell him that Baxter's corporate information policies prevented the sharing of Baxter computers and any restricted information on them with persons outside of Baxter. The attorneys for both parties were copied on the letter.

¶ 19     Carlson filed a "motion to advise" the trial court that he would not produce his computers for inspection and sought an order holding him in "friendly" contempt so that he could appeal the trial court's ruling. On October 21, 2015, at the presentation of that motion, Carlson also orally sought leave to file an affidavit by Padgitt, which Carlson's attorney said he had received only the day before. In the affidavit, Padgitt stated that Carlson neither owned nor leased his computer from Baxter, which owned both the computer and its contents. Padgitt stated that Baxter's computer contained personally identifiable information of Baxter customers and other information restricted under Baxter's global information classification and trade secret policy. Padgitt further averred that, if Carlson were to deliver his work computer (and his password, which would be necessary to access the contents of the computer) to the defendants' expert for inspection and copying, he would be violating several of Baxter's corporate policies and would be subject to disciplinary measures, including termination.

¶ 20    The defendants objected to the filing of the affidavit, saying that it was not an exhibit to anything and should have been filed earlier. The trial court told Carlson that it would not entertain the motion to advise, because the motion was not in a form sufficient to inform the court regarding the terms of the order with which Carlson did not wish to comply. Further, the trial court would not allow the filing of the affidavit standing alone. However, Carlson could refile the motion, and he could attach whatever support the motion required, "such as affidavits."

¶ 21    One week later, Carlson filed an amended motion to advise, explaining in greater detail the reasons he did not wish to comply with the trial court's order of September 23, 2015, and attaching a copy of the order. He did not attach the Padgitt affidavit to his amended motion. On November 17, 2015 (the court date for the amended motion to advise), Carlson filed a motion to reconsider the trial court's denial of leave to file the Padgitt affidavit, arguing that the oral motion to file the affidavit had not been untimely, because he had received the affidavit from Padgitt only the afternoon before, and attaching the previous correspondence from Padgitt to show that the defendants had received advance notice of Baxter's contention that the work computer belonged to Baxter. Carlson attached the Padgitt affidavit to the motion to reconsider. The defendants again objected to the filing of the affidavit, saying that it should have been attached to Carlson's response to the motion to compel and that its inclusion now would allow Carlson to "bolster" his position on appeal without allowing the defendants an opportunity to respond. In separate orders, the trial court denied the motion to reconsider its ruling denying leave to file the affidavit and found Carlson in "friendly" contempt, fining him $500.

¶ 22    Carlson filed a timely notice of appeal, pursuant to Illinois Supreme Court Rule 304(b)(5) (eff. Feb. 26, 2010), from the order dated September 23, 2015 (compelling the inspection of his computers and his work laptop); the order dated October 21, 2015 (denying his oral motion for leave to file the Padgitt affidavit); and both of the orders of November 17, 2015.

¶ 23                                    II. ANALYSIS

¶ 24    Although discovery orders are not final orders and thus ordinarily are not appealable, the correctness of a discovery order may be tested through contempt proceedings where, as here, a party is found in contempt for refusing to comply with a discovery order. *Norskog v. Pfiel*, 197 Ill. 2d 60, 69 (2001); see Ill. S. Ct. R. 304(b)(5) (eff. Feb. 26, 2010) (contempt orders are immediately appealable). In such an appeal, our review of the contempt order necessarily involves a review of the orders on which the finding of contempt was based. *Norskog*, 197 Ill. 2d at 69. Unless the appeal raises a purely legal issue, we review discovery orders for abuse of discretion. *Kaull v. Kaull*, 2014 IL App (2d) 130175, ¶ 22.

¶ 25    The issue at the heart of this appeal is the circumstances under which a party to a civil suit may inspect the contents of another person's computer through forensic imaging, seeking metadata and other information. There appears to be a dearth of case law on this issue in Illinois. Accordingly, we begin with a review of the rules applicable to discovery in civil litigation and the constitutional privacy concerns protected by those rules.

¶ 26                                  A. Civil Discovery

¶ 27    In Illinois, discovery in civil actions is governed by Illinois Supreme Court Rules 201 through 224. Rule 201 (Ill. S. Ct. R. 201 (eff. July 1, 2014)) sets out several of the general

principles regarding such discovery. A party may serve discovery upon another party to obtain "full disclosure regarding any matter relevant to the subject matter involved in the pending action, whether it relates to the claim or defense." Ill. S. Ct. R. 201(b)(1) (eff. July 1, 2014). However, "discovery requests that are disproportionate in terms of burden or expense should be avoided." Ill. S. Ct. R. 201(a) (eff. July 1, 2014). Discovery from nonparties may be sought pursuant to Rule 204, which permits the service of subpoenas for deposition or for the production of documents or other tangible things. Ill. S. Ct. R. 204(a) (eff. July 1, 2014).

¶ 28        Interrogatories under Rule 213 and requests to produce under Rule 214(a) must be served in writing upon the responding party, which then has "a reasonable time" to respond or object to each request. Ill. S. Ct. R. 213 (eff. Jan. 1, 2007); R. 214(a) (eff. July 1, 2014). One ground for objecting is that "the burden or expense of producing the requested materials would be disproportionate to the likely benefit, in light of the factors set out in Rule 201(c)(3)." Ill. S. Ct. R. 214(c) (eff. July 1, 2014).

¶ 29        Significantly, the discovery rules envision that the responding party will search for, identify, and produce the information specifically requested by the other party. They do not permit the requesting party to rummage through the responding party's files for helpful information. Under Rules 213 and 214, a party must request specific information relevant to the issues in the lawsuit from the other party, which then searches its own files and electronic storage media for responsive information and produces that information. See Ill. S. Ct. R. 213 (eff. Jan. 1, 2007); R. 214(a) (eff. July 1, 2014).

¶ 30        Rule 201(c) (Ill. S. Ct. R. 201(c) (eff. July 1, 2014)), which aims to prevent discovery abuse, contains several provisions for limiting discovery. One approach is a protective order, which may be entered "as justice requires, denying, limiting, conditioning, or regulating discovery to prevent unreasonable annoyance, expense, embarrassment, disadvantage, or oppression." Ill. S. Ct. R. 201(c)(1) (eff. July 1, 2014). Another protection is the relatively new "proportionality" provision, which states:

> "When making an order under this Section, the court may determine *whether the likely burden or expense of the proposed discovery*, including electronically stored information, *outweighs the likely benefit*, taking into account the amount in controversy, the resources of the parties, the importance of the issues in the litigation, and the importance of the requested discovery in resolving the issues." (Emphaseis added.) Ill. S. Ct. R. 201(c)(3) (eff. July 1, 2014).

The protections of Rule 201(c) apply to discovery directed to parties and nonparties alike. See Ill. S. Ct. R. 201(c)(1), (c)(2) (eff. July 1, 2014) (the court may act upon a motion by "any party or witness"); R. 204(a)(1) (eff. July 1, 2014) (subpoenas issued to nonparties are "subject to any limitations imposed under Rule 201(c)"). As a whole, "Rule 201 and related rules governing specific discovery methods form a comprehensive scheme for fair and efficient discovery with judicial oversight to protect litigants from harassment." *Kunkel v. Walton*, 179 Ill. 2d 519, 531 (1997).

¶ 31        The civil discovery rules are not blind to the privacy interests of the party responding to discovery. Although the scope of permissible discovery can be quite broad, "parties engaged in litigation do not sacrifice all aspects of privacy or their proprietary information simply because of a lawsuit." *In re Mirapex Products Liability Litigation*, 246 F.R.D. 668, 673 (D. Minn. 2007). We briefly review the nature of those privacy concerns and the ways in which

the discovery rules address those concerns.

¶ 32                    B. Constitutional Right to Privacy and Civil Discovery

¶ 33    The fourth amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. The Illinois Constitution contains even broader protection, providing that "[t]he people shall have the right to be secure in their persons, houses, papers, and other possessions against unreasonable searches, seizures, *invasions of privacy* or interceptions of communications by eavesdropping devices or other means." (Emphasis added.) Ill. Const. 1970, art. I, § 6. The Illinois Supreme Court has observed that "the Illinois Constitution goes beyond federal constitutional guarantees by expressly recognizing a zone of personal privacy, and *** the protection of that privacy is stated broadly and without restrictions." *Kunkel*, 179 Ill. 2d at 537 (citing *In re May 1991 Will County Grand Jury*, 152 Ill. 2d 381, 391 (1992)).

¶ 34    The constitutional right embodied in the privacy clause of the Illinois Constitution arose from the desire to safeguard against the collection and exploitation of intimate personal information. *People v. Mitchell*, 165 Ill. 2d 211, 220 (1995) (citing the comments of the drafters of the privacy clause, which was added to the constitution in 1970); see also *People v. Caballes*, 221 Ill. 2d 282, 330-31 (2006) (the drafters of the privacy clause intended to protect against infringements on "the zone of personal privacy," such as those that "reveal private medical information" or "the contents of diaries or love letters; *** the individual's choice of reading materials, whether religious, political, or pornographic; *** [or] sexual orientation or marital infidelity"); *In re Will County Grand Jury*, 152 Ill. 2d at 396 (privacy clause protects against disclosure of personal medical and financial records). In short, under the privacy clause, "a person has a reasonable expectation that he will not be forced to submit to a close scrutiny of his personal characteristics, unless for a valid reason." *In re Will County Grand Jury*, 152 Ill. 2d at 391-92.

¶ 35    These constitutional provisions do not forbid all invasions of privacy, only those that are unreasonable. U.S. Const., amend. IV (freedom from "unreasonable searches and seizures"); Ill. Const. 1970, art. I, § 6 (freedom from "unreasonable *** invasions of privacy"). The civil discovery rules adopt two safeguards to ensure that the discovery of private information will be "reasonable" (and hence constitutional): relevance and proportionality.

¶ 36                                      1. Relevance

¶ 37    "In the context of civil discovery, reasonableness is a function of relevance." *Kunkel*, 179 Ill. 2d at 538. The supreme court rules governing civil discovery advance this principle by limiting discovery to information that is relevant to the issues in the lawsuit. See Ill. S. Ct. R. 201(b)(1) (eff. July 1, 2014) (parties may discover "any matter relevant to the subject matter [of] the pending action"). Although relevant (discoverable) information is defined broadly to encompass not only admissible information but also information calculated to lead to the discovery of admissible information (*In re Estate of O'Hare*, 2015 IL App (2d) 140073, ¶ 14), this definition is not intended as an invitation to invent attenuated chains of possible relevancy. The corollary to the relevance requirement is that the compelled disclosure of highly personal information "having no bearing on the issues in the lawsuit" is an unconstitutional invasion of privacy. *Kunkel*, 179 Ill. 2d at 539; see also *Firebaugh v. Traff*,

353 Ill. 82, 85 (1933) (a court order "cannot be used to procure a general investigation of a transaction not material to the issue"). The concept of relevance provides a foundation in balancing constitutional privacy concerns with the need for reasonable discovery, "facilitat[ing] trial preparation while safeguarding against improper and abusive discovery." *Kunkel*, 179 Ill. 2d at 531.

¶ 38                                2. Proportionality[1]

¶ 39    Proportionality imposes a second limitation on what is discoverable: even if it is relevant, information need not be produced if the benefits of producing it do not outweigh the burdens. The legitimate privacy concerns of the responding party are one of the burdens that a court can and should consider in conducting this balancing test.

¶ 40    The proportionality balancing test requires a court to consider both monetary and nonmonetary factors in determining "whether the likely burden or expense of the proposed discovery *** outweighs the likely benefit." Ill. S. Ct. R. 201(c)(3) (eff. July 1, 2014). The monetary factors expressly identified in Rule 201(c)(3) include "the expense of the proposed discovery," "the amount in controversy," and "the resources of the parties." *Id.* Nonmonetary factors include "the importance of the issues in the litigation" (*i.e.*, the societal importance of the issues at stake) and "the importance of the requested discovery in resolving the issues." *Id.* All of these factors must be considered to the extent that they are relevant to the circumstances of each case.

¶ 41    However, Rule 201(c) also gives trial courts the power and responsibility to limit or deny discovery as necessary to prevent unreasonable "embarrassment" and "oppression." Ill. S. Ct. R. 201(c)(1) (eff. July 1, 2014). Given this overarching purpose, courts should also consider other factors that might be present in a particular case. One such factor is the extent to which the discovery sought represents a substantial invasion of the privacy interests of the responding party. See *Johnson v. Nyack Hospital*, 169 F.R.D. 550, 562 (S.D.N.Y. 1996) (the trial court's power to limit discovery may be employed where the burden is not monetary expense but "lies instead in the adverse consequences of the disclosure of sensitive, albeit unprivileged, material"); Agnieszka A. McPeak, *Social Media, Smartphones, and Proportional Privacy in Civil Discovery*, 64 U. Kan. L. Rev. 235, 236 (2015) ("non-pecuniary burdens on privacy should be factored into the proportionality analysis"). Another potentially

---

[1]There is little Illinois case law interpreting the proportionality rule, which was added only two years ago. However, the Federal Rules of Civil Procedure include a similar proportionality provision (Fed. R. Civ. P. 26(b)(1)), and there is a substantial body of case law interpreting that provision. Further, the 2014 amendments to the Illinois civil discovery rules explicitly draw upon the federal rules. See Ill. S. Ct. R. 201, Committee Comments (rev. May 29, 2014) (Rule 201(b)(1) was amended to conform with the definition of electronically stored information (ESI) in Rule 201(b)(4) and "complies with the Federal Rules of Civil Procedure"; Rule 201(b)(4), the definition of ESI, "comports with the Federal Rule of Civil Procedure 34(a)(1)(a)"; and the committee comments to Rule 201(c) cite the United States Seventh Circuit Court of Appeals' "Principles Relating to the Discovery of Electronically Stored Information" as the source for the list of categories of ESI that "often *** should not be discoverable" under the proportionality balancing test); Seventh Circuit Electronic Discovery Committee, *Principles Relating to the Discovery of Electronically Stored Information* (rev. Aug. 1, 2010), http://www.discoverypilot.com/sites/default/files/Principles8_10.pdf. Accordingly, we draw on federal case law as necessary for guidance in applying the Illinois proportionality rule.

relevant factor is whether the discovery is sought from a nonparty without any direct stake in the outcome of the litigation. See *Tucker v. American International Group, Inc.*, 281 F.R.D. 85, 92 (D. Conn. 2012) (nonparty status is "a significant factor in determining whether discovery is unduly burdensome" (internal quotation marks omitted)); see also *Katz v. Batavia Marine & Sporting Supplies, Inc.*, 984 F.2d 422, 424 (Fed. Cir. 1993) (nonparty status weighs against requiring disclosure of confidential information). Given the trial court's obligation to conduct the balancing test so as to "facilitate[ ] trial preparation while safeguarding against improper and abusive discovery" (*Kunkel*, 179 Ill. 2d at 531), the proportionality analysis must take all of these factors into consideration as appropriate in each case.

¶ 42                         C. Electronically Stored Information

¶ 43    Recognizing the growing use of computers in every aspect of daily life, in 2014 the Illinois Supreme Court amended its rules to explicitly provide for the discovery of electronically stored information (ESI). Rule 201(b)(4) defines ESI to include, among other things, any "data or data compilations in any medium from which electronically stored information can be obtained." Ill. S. Ct. R. 201(b)(4) (eff. July 1, 2014). This definition of ESI "comports with the Federal Rule of Civil Procedure 34(a)(1)(a) and is intended to be flexible and expansive as technology changes." Ill. S. Ct. R. 201, Committee Comments (rev. May 29, 2014). Rule 201(b)(1), which permits the discovery of any relevant matter, including documents and other tangible things, was amended to note that the word "documents" includes ESI. Ill. S. Ct. R. 201(b)(1) (eff. July 1, 2014). As we discuss in more detail below, other amendments, such as the addition of the proportionality provision to Rule 201(c), were intended to provide additional protection against abusive requests to discover ESI. Ill. S. Ct. R. 201, Committee Comments (May 29, 2014).

¶ 44    The discovery of ESI presents some challenges that do not arise with paper documents or other tangible items, including the risk of substantially higher production costs, the need for technical expert involvement in production, and increased privacy concerns. "For example, ESI is retained in exponentially greater volume than hardcopy documents, is dynamic rather than static, and is sometimes incomprehensible when separated from its system." Jeffrey A. Parness, *Managing Discovery of Electronically Stored Information in Illinois*, 101 Ill. B.J. 316 (2013). Most litigators are familiar with the effort and expense involved in reviewing documents prior to production to ensure that privileged, confidential, and irrelevant information is identified and protected from inadvertent production. That effort and expense can be much higher when dealing with the volume of information that can be stored electronically. Further, depending on the form of the discovery responses, significant metadata may be produced alongside the responsive documents, sometimes without the realization of the responding party. These facts, along with technical unfamiliarity on the part of many attorneys, may require the participation of experts in electronic discovery to ensure that relevant and discoverable information is produced, in a usable form, and that privileged, confidential, and irrelevant information is not produced.

¶ 45    Further, examining the information stored on electronic devices can raise unique privacy concerns. As the United States Supreme Court noted in *Riley v. California*, 573 U.S. ___, ___, 134 S. Ct. 2473, 2484 (2014), digital content is different from physical objects, and an attempt to search that content must be considered differently. "Most people cannot lug

around every piece of mail they have received for the past several months, every picture they have taken, or every book or article they have read—nor would they have any reason to attempt to do so." *Id.* at ___, 134 S. Ct. at 2489. However, because of the enormous storage capacity of most computers, the search of a computer can reveal all of these items and more—"a digital record of nearly every aspect of their lives—from the mundane to the intimate." *Id.* at ___, 134 S. Ct. at 2490. In addition, computer content can reveal individuals' "private interests or concerns" through their internet browsing history; information about where they travel and the people with whom they communicate; and intimate details ranging from weight-control efforts to banking and shopping records. *Id.* at ___, 134 S. Ct. at 2490. Indeed, computer programs and networks frequently access information beyond the data stored on a single computer (*id.* at ___, 134 S. Ct. at 2491), and the search of one person's computer may provide access to the private information of third parties without their knowledge or consent. The Supreme Court observed that the privacy concerns raised by searches of computerized devices[2] "dwarf" those raised by the inspection of physical items. *Id.* at ___, 134 S. Ct. at 2491.

¶ 46            D. Limits on the Discovery of ESI Under the Proportionality Rule

¶ 47    Although it is worded broadly to apply to all discovery requests, the proportionality requirement of Rule 201(c)(3) specifically targets the challenges posed by the discovery of ESI. See Ill. S. Ct. R. 201, Committee Comments (rev. May 29, 2014) (the proportionality provision "was added to address the production of materials when benefits do not outweigh the burden of producing them, *especially in the area of electronically stored information (ESI)*" (emphasis added)).

¶ 48    The proportionality rule "requires a case-by-case analysis." *Id.* However, the rules committee has identified several categories of ESI that the proportionality balancing test "often may indicate *** *should not be discoverable*," presumably because the burden of producing such ESI generally is high. (Emphasis added.) *Id.* These categories include:

> "(A) 'deleted,' 'slack,' 'fragmented,' or 'unallocated' data on hard drives; (B) random access memory ('RAM') or other ephemeral data; (C) on-line access data; (D) data in metadata fields that are frequently updated automatically; (E) backup data that is substantially duplicative of data that is more accessible elsewhere; (F) legacy data; (G) information whose retrieval cannot be accomplished without substantial additional programming or without transforming it into another form before search and retrieval can be achieved; and (H) other forms of ESI whose preservation or production requires extraordinary affirmative measures." *Id.* (citing Seventh Circuit Electronic Discovery Committee, *Principles Relating to the Discovery of Electronically Stored Information* (rev. Aug. 1, 2010), at 4, http://www.discoverypilot.com/sites/default/files/Principles8_10.pdf (Principle 2.04(d))).

Discovery of these categories of ESI is not absolutely prohibited: such discovery may be ordered where warranted in a particular case. *Id.* However, if a party intends to seek any of

---

[2]Although *Riley* involved cell phones, the Supreme Court's comments are equally applicable to any modern computerized device that can store great quantities of data. Indeed, the Court noted that smartphones are essentially "minicomputers." *Id.* at ___, 134 S. Ct. at 2489.

these types of ESI, that intent "should be addressed at the initial case management conference." *Id.*

¶ 49　　In essence, the committee comments suggest that these categories of ESI are presumptively nondiscoverable, shifting the burden to the requesting party to justify the making of an exception based on the particular circumstances of the case. Illinois has yet to develop a framework for analyzing such requests. However, we find helpful the analysis that Colorado's supreme court has developed over the last several years in cases involving requests for forensic imaging of computers. See *In re Gateway Logistics, Inc.*, 2013 CO 25; *In re District Court*, 256 P.3d 687 (Colo. 2011) (*en banc*); *People v. Spykstra*, 234 P.3d 662 (Colo. 2010); *In re Cantrell*, 195 P.3d 659 (Colo. 2008). Carlson urges us to adopt this analysis for all discovery requests involving ESI or forensic imaging. We think that this argument is better directed to our supreme court, and thus we decline to formally adopt the analysis. Nevertheless, we agree that the Colorado cases lay out an easy-to-apply approach that could be adapted for discovery requests for information in the categories listed in the committee comments to Rule 201 as follows: once the responding party objects on the ground that the information sought falls into one of those categories, the burden shifts to the requesting party to show that (1) there is a compelling need for the information, (2) the information is not available from other sources, and (3) the requesting party is using the least intrusive means to obtain the information. See, *e.g.*, *Gateway Logistics*, 2013 CO 25, ¶ 15; *District Court*, 256 P.3d at 691-92. We believe that this analysis is consistent with the policies embodied in the 2014 amendments and the committee comments to Rule 201.

¶ 50　　　　　　　　　　E. Forensic Imaging of Carlson's Computers[3]

¶ 51　　We now turn to the central issue in this appeal: did the trial court abuse its discretion in ordering the forensic imaging of Carlson's computers, subject only to the limitations in the protective order? The answer is yes, for the reasons that follow.

¶ 52　　　　　　　　　　1. The Request Is Contrary to Discovery Protocol

¶ 53　　First, the defendants' request to create and search a forensic image of Carlson's computers runs counter to the traditional protocol of discovery, in which one party requests specific information and the other party searches its own files (and computers) to identify and produce responsive information. See, *e.g.*, Ill. S. Ct. R. 214 (eff. July 1, 2014) (setting out framework of requests to produce and responses). As we have already noted, the supreme court rules governing civil discovery contemplate that the responding party has both the right and the obligation to conduct the search for the information responsive to a discovery request. See *supra* ¶ 29. There is no provision allowing the requesting party to conduct its own search of the responding party's files—regardless of whether those files are physical or electronic.

¶ 54　　When faced with a similar request to search another party's computers for relevant information, the Eleventh Circuit Court of Appeals commented that Rule 34(a) (the federal counterpart to Illinois Supreme Court Rule 214) "allows the responding party to search his records to produce the required, relevant data. Rule 34(a) does not give the requesting party

---

[3]For the moment, we leave aside the question of whether Baxter owns or controls Carlson's work computer.

the right to conduct the actual search." *In re Ford Motor Co.*, 345 F.3d 1315, 1317 (11th Cir. 2003); see also *Menke v. Broward County School Board*, 916 So. 2d 8, 10 (Fla. Dist. Ct. App. 2005) ("In civil litigation, we have never heard of a discovery request which would simply ask a party litigant to produce its business or personal filing cabinets for inspection by its adversary to see if they contain any information useful to the litigation.").

¶ 55    It is possible that such an inversion of traditional discovery protocol might be appropriate in rare circumstances. However, foreign case law has identified only two circumstances in which a search of another party's computer is appropriate: where the computer itself is directly involved in the cause of action or where there is evidence of substantial prior discovery violations by the responding party. Examples of the first include *Genworth Financial Wealth Management, Inc. v. McMullan*, 267 F.R.D. 443, 447 (D. Conn. 2010) (claim that defendant used the computers at issue to disseminate plaintiff's confidential information), and *G.D. v. Monarch Plastic Surgery, P.A.*, 239 F.R.D. 641, 643 (D. Kan. 2007) (claim that defendant medical practice improperly left computer containing plaintiffs' confidential information on the curb for disposal).

¶ 56    As to the second possible situation, when a party seeks forensic imaging on the basis of prior noncompliance with traditional discovery, courts have required a significant history of demonstrated noncompliance. See *Ford Motor Co.*, 345 F.3d at 1317; *A.M. Castle & Co. v. Byrne*, 123 F. Supp. 3d 895, 900-01 (S.D. Tex. 2015); *Menke*, 916 So. 2d at 12 (noting that, "in the few cases we have found across the country permitting access to another party's computer, all have been in situations where evidence of intentional deletion of data was present" and citing cases); *cf. Bennett v. Martin*, 186 Ohio App. 3d 412, 2009-Ohio-6195, 928 N.E.2d 763 (ordering inspection of defendant's computers where defendant produced almost 16,000 pages of email strings in "seemingly random disorder," defendant refused to comply with multiple court orders regarding discovery, and defendant's general counsel admitted in deposition that defendant had withheld responsive documents). When a court weighs whether this factor is present, the requesting party's mere suspicion that the responding party might not have produced all responsive information is not sufficient to justify forensic imaging. *McCurdy Group, LLC v. American Biomedical Group, Inc.*, 9 F. App'x 822, 831 (10th Cir. 2001) (general skepticism about the completeness of production, standing alone, was not sufficient to justify the "drastic discovery measure" of requiring the production of the entire contents of the plaintiff's computer drives); *John B. v. Goetz*, 531 F.3d 448, 460 (6th Cir. 2008) (same).

¶ 57    In this case, neither circumstance is present: there is no record of noncompliance with discovery, and there is no particular nexus between Carlson's computers and the legal claim, as this is an ordinary personal injury case. Accordingly, there is no support for the defendants' request to invert the traditional discovery protocol.

### 2. Relevance and Proportionality

¶ 59    Further, a careful consideration of relevance and proportionality reveals that forensic imaging was not justified in this case. The information sought was not clearly specified and the probative value of that information was questionable, while the burden to Carlson's privacy interest was significant. (These considerations would apply to any discovery request, but they have special significance here, where the defendants specifically requested forensic imaging.)

¶ 60 The defendants sought a copy of the entire contents of all of Carlson's computers in order to search for (1) time stamps showing when Carlson had used each particular computer "at work or for work purposes," (2) time stamps showing when Carlson had used each computer to play "computer games," (3) "search terms with respect to" various symptoms Carlson claims to have experienced as a result of the collision, and (4) any documents Carlson created "with respect to his symptoms and/or research regarding" these search terms.

¶ 61 As an initial matter, the list of items sought by the defendants is ambiguous and lacks crucial details about the information the defendants seek. For instance, the information sought in the first item on the list presumably would require an examination of the laptop Carlson uses for work, but how do the defendants propose to identify whether Carlson's past use of the laptop occurred while he was "at work" (on site at Baxter) or whether his use of it was "for work purposes"? Does the phrase "search terms" in the third item mean that the defendants want to know if Carlson performed Internet searches using those phrases, or that the defendants want to search the copy of his computers' hard drives for those terms? And how do the defendants propose to identify the documents they seek in the fourth item?

¶ 62 Questions like these often lead parties seeking forensic imaging to submit affidavits from computer experts, explaining the type of information the experts expect to find on the computers at issue, the methods by which they will identify and recover only the information sought, and the costs of the entire procedure. Expert involvement in formulating the parameters of the search is often essential, both to ensure that what is sought can actually be recovered and to provide information about the search process so that the court and the responding party can appropriately monitor the process. As one court has noted, even a seemingly basic task like formulating appropriate search terms "is a complicated question involving the interplay, at least, of the sciences of computer technology, statistics and linguistics" and is "clearly beyond the ken of a layman," requiring the participation of an expert. *United States v. O'Keefe*, 537 F. Supp. 2d 14, 24 (D.D.C. 2008). In this case, the transcript of the hearing on the motion to compel shows that the trial court was hampered by the lack of any expert testimony regarding the proposed forensic imaging and search. The defendants' attempt to substitute their own assertions on these topics could not cure the lack of such evidence. Indeed, at oral argument on appeal, the defendants conceded that they could not answer technical questions about the proposed search without consulting with their expert. The trial court abused its discretion in permitting forensic imaging despite the lack of adequate definitions and parameters for the proposed search.

¶ 63 Further, the proposed forensic imaging had little relevance to the litigation. Rule 201 requires that the information sought be relevant to the issues in the lawsuit. See Ill. S. Ct. R. 201(b)(1) (eff. July 1, 2014). The trial court apparently accepted the defendants' argument that information about when Carlson was working and when he was playing computer games could be relevant to determining the extent of the damage caused by the accident. Carlson's research on his symptoms could also possibly be relevant, although we note that evidence of such research may have limited probative value, as it could be motivated by either proper purposes (researching one's own symptoms to allay personal health concerns) or improper purposes (discovering the symptoms one would report to support a claim of brain injury). However, as a request for forensic imaging was involved, the court had to consider not only the relevance of the information sought by the defendants but also the broad means by which they proposed to discover it—forensic imaging of all of the computers' hard drives. As noted

above, the contents of Carlson's computers would have greater relevance if the computers themselves were at the heart of the claims raised. However, that is not the case here, where the discovery method chosen by the defendants has no particular relevance to the cause of action.

¶ 64     Moreover, there were ample avenues open to the defendants to discover the information they sought without granting them the broad access to Carlson's computers that they sought. For instance, there is no indication that they ever sought to determine, through requests to admit or deposition questions, whether Carlson performed Internet searches on the symptom terms they found suspicious, nor did they ever request that Carlson supplement his previous production of his symptoms log. And, as the trial court itself noted, they could have subpoenaed from the game companies the information they sought about Carlson's online game-playing—but they did not. Instead, the defendants appear to have abandoned traditional methods of discovery to pursue far more intrusive methods of gaining the information they sought.

¶ 65     It is here that the balancing test of the proportionality rule comes into play. The potential utility of the discovery sought by the defendants must be weighed against the burden imposed by the discovery method the defendants have requested. Forensic imaging of all of the contents of Carlson's computers will yield an enormous amount of data that goes far beyond the issues that are relevant to this suit, potentially including personal photographs, declarations of love, bank records and other financial information, records of online purchases, confidential information about family and friends contained in communications with them, and private online activities utterly unconnected to this suit. A request to search the forensic image of a computer is like asking to search the entire contents of a house merely because some items in the house might be relevant. Because such a search is not narrowly restricted to yield only relevant information, it poses a high risk of being overbroad and intrusive in a manner that violates the constitutional right to privacy. See *Kunkel*, 179 Ill. 2d at 538-39 (broad measure that required the disclosure of confidential personal information, "without regard to the issues being litigated," was "unreasonable and unconstitutional"); *People v. Lurie*, 39 Ill. 2d 331, 335 (1968) ("a subpoena *** which is unreasonably broad in its demand," seeking irrelevant information, is unconstitutional). The low probative value of the information being sought does not justify a broad and intrusive method of obtaining that information that is likely to sweep in substantial amounts of irrelevant information. A party may not "dredge an ocean of *** electronically stored information and records in an effort to capture a few elusive, perhaps non-existent, fish." *Tucker*, 281 F.R.D. at 95.

¶ 66     Finally, most of the information sought by the defendants here appears to fall into the categories of ESI identified by the rules committee as presumptively not discoverable under the proportionality balancing test. Ill. S. Ct. R. 201, Committee Comments (rev. May 29, 2014). For instance, the defendants' request for "time stamps" for work-related tasks and online computer game-playing appears to seek "data in metadata fields that are frequently updated automatically" and "on-line access data." *Id.* Likewise, the request for a history of Carlson's online searches regarding his reported symptoms constitutes a request for "on-line access data." *Id.* Indeed, the forensic imaging process itself might fall into this category as seeking " 'deleted,' 'slack,' 'fragmented,' or 'unallocated' data on hard drives." *Id.*; see, *e.g.*, *United States v. Triumph Capital Group, Inc.*, 211 F.R.D. 31, 48 (D. Conn. 2002) ("A mirror

image is an exact duplicate of the entire hard drive, and includes all the scattered clusters of the active and deleted files and the slack and free space.").

¶ 67     If the information sought is presumptively nondiscoverable, the defendants would have to establish that discovery of the particular information was warranted in order to gain access to the information. (The *Gateway Logistics* test may be helpful in making the determination, but as noted above we do not formally adopt that test; a trial court may consider any factors it considers helpful to the determination, bearing in mind the restrictive intent expressed in the committee comments to Rule 201.) However, as the record in this case lacks any technical expert opinions on this point, we do not reach a conclusion on this question. Instead, we focus on the larger proportionality considerations that apply to a request for forensic imaging.

¶ 68     The drafting committee for the 2006 amendments to Federal Rule of Civil Procedure 34 expressly identified privacy interests as a substantial concern raised by requests for forensic imaging or other direct searches of an opposing party's computers:

> "Inspection or testing of *** a responding party's electronic information system [*e.g.*, a computer] may raise issues of confidentiality or privacy. The addition of [provisions for] testing and sampling to Rule 34(a) with regard to *** electronically stored information is not meant to create a routine right of direct access to a party's electronic information system ***." Fed. R. Civ. P. 34(a) advisory committee's note to 2006 amendment.

Indeed, because "the mere imaging of the media, in and of itself, raises privacy and confidentiality concerns" and "[d]uplication, by its very nature, increases the risk of improper exposure, whether purposeful or inadvertent" (*John B.*, 531 F.3d at 457), even the entry of a carefully drafted protective order might not be enough to overcome the privacy concerns arising in a particular case. "Thus courts are very cautious about ordering mirror imaging of computers, especially where the request is overly broad and where the connection between the party's claims and the computer is vague and unproven." *A.M. Castle*, 123 F. Supp. 3d at 900. For all of these reasons, compelled forensic imaging should be a last resort. See 10 Jeffrey S. Kinsler & Jay E. Grenig, Illinois Practice § 23.72 (2d rev. ed. 2016) ("A very high threshold will have to be cleared in order to conduct such discovery."). Further, in making such a determination, a court must consider the balancing test of the proportionality rule, considering the appropriate monetary and nonmonetary factors present in the case before it to determine whether the burdens resulting from forensic imaging outweigh the likely benefit.

¶ 69     Here, the trial court did not conduct the balancing test required by the proportionality rule. This failure to apply the correct legal analysis was an abuse of discretion. *Koon v. United States*, 518 U.S. 81, 100 (1996) (a trial court "by definition abuses its discretion when it makes an error of law"). Accordingly, the trial court's order compelling the forensic imaging of Carlson's computers cannot stand.

¶ 70     Because the trial court did not apply the correct legal analysis in deciding whether to order forensic imaging of Carlson's computers, we must remand to allow it to reconsider its decision under the correct standard. Before concluding our work, however, we address two other issues raised by Carlson on appeal: whether he must produce the computer he uses for his work for Baxter, and whether he may file an affidavit relevant to this point.

¶ 72    Under Illinois Supreme Court Rule 214(a) (eff. July 1, 2014) a party may obtain the production of documents or other tangible things, including ESI, only from another party. If the responding party does not have the requested item in his "possession or control," he must notify the requesting party of this fact, providing any information he has about the item's ownership or whereabouts. Ill. S. Ct. R. 214(c) (eff. July 1, 2014). When a party seeks the production of an item from a nonparty, it must issue a subpoena to that party. Ill. S. Ct. R. 204(a)(4) (eff. July 1, 2014); *cf. Redmond v. Central Community Hospital*, 65 Ill. App. 3d 669, 674 (1978) ("it is obvious that the [discovery] rules were intended to provide *** the means to discover relevant matter from other parties by motion or upon written request and, from third persons, through the use of subpoenas").

¶ 73    In this case, Carlson has asserted that he cannot produce the laptop provided to him by Baxter because it does not belong to him. All of the evidence in the record thus far supports this assertion. Even apart from the Padgitt affidavit—which was filed as an exhibit to Carlson's motion to reconsider and was never ordered stricken, and thus is contained within the record on appeal although it was not formally received into the record—Carlson testified to this at his deposition.

¶ 74    The defendants have not argued that Carlson's actions in occasionally taking the laptop home constitute "possession or control" of it. Even if they had raised this argument, the occasional past possession of an item does not mean that a party can now be required to produce it if it is no longer in his possession. See *Wiebusch v. Taylor*, 97 Ill. App. 3d 210, 214 (1981) (where party no longer had possession of the car he had dropped off for repairs, which he did not own, he could not be required to produce it). Further, even present possession of an item might not constitute legal "possession or control" requiring production of the item if the party holds it as an agent for another under a restrictive agreement. See, *e.g.*, *In re Shell E&P, Inc.*, 179 S.W.3d 125, 130 (Tex. Ct. App. 2005) (where an agent or employee has permissive "temporary custody" of an item subject to a restrictive confidentiality agreement, the agent or employee cannot be ordered to produce the item; instead, the requesting party must seek the item from the principal or employer). Thus, the trial court abused its discretion in ordering Carlson to produce the laptop for inspection by the defendants.

¶ 75    Carlson also contends that the trial court erred in denying him leave to file the Padgitt affidavit (in its order of October 21, 2015, denying his oral motion for leave to file, and its order of November 17, 2015, denying his motion for reconsideration). The defendants argue that we cannot entertain this contention because our jurisdiction in an appeal from the order finding Carlson in contempt does not encompass a review of the orders denying leave to file the Padgitt affidavit. Carlson responds that the Padgitt affidavit is relevant to a consideration of whether his noncompliance with the order for forensic imaging was justifiable, and so we may review the trial court's rulings regarding the affidavit. We agree with Carlson.

¶ 76    The trial court ordered Carlson to produce for inspection not only his own computers, but also the computer he used for work. Carlson contended that he did not own the work computer, which was provided to him by Baxter, and he offered the affidavit as proof of his nonownership. Accordingly, the testimony provided by the affidavit was directly relevant to the issue of whether Carlson could be compelled to produce that computer (or sanctioned for

failing to produce it). As such, the correctness of the trial court's order sanctioning Carlson is intertwined with the correctness of the orders denying Carlson leave to file the affidavit, and all of these orders are within the scope of our review. *Norskog*, 197 Ill. 2d at 69. For the same reason—the clear relevance of the Padgitt affidavit to a disputed factual issue, the ownership of the work laptop—we find that the trial court abused its discretion in denying Carlson leave to file the affidavit. See *Workforce Solutions v. Urban Services of America, Inc.*, 2012 IL App (1st) 111410, ¶ 41 (where an issue is disputed, the trial court must conduct an evidentiary hearing; the dispute must be resolved through the consideration of evidence, not the arguments of counsel). On remand, if the ownership of the work laptop remains a disputed issue, the trial court must allow the parties to present evidence on the issue.

¶ 77                                    III. CONCLUSION

¶ 78        For all of these reasons, we vacate the trial court's September 23, 2015, order compelling Carlson to produce his computers for forensic imaging, the protective order of the same date, and the trial court's October 21 and November 17, 2015, orders denying leave to file the Padgitt affidavit. Further, the record reflects that Carlson showed no disdain for the court and merely refused to comply with its September 23, 2015, order in good faith to secure appellate interpretation of this legal issue. We therefore vacate the contempt order dated November 17, 2015. See *In re Marriage of Earlywine*, 2013 IL 114779, ¶ 36.

¶ 79        Vacated and remanded.

¶ 80        JUSTICE McLAREN, specially concurring.

¶ 81        I specially concur because I wish to expound on what should be addressed by the trial court upon remand. The majority opinion is well reasoned as far as it goes. It touches upon the issue of relevance in the classical sense that there may be evidence that, despite being digitized on a computer, would still be relevant in proving or disproving injuries proximately caused by the admitted liability of the defendants. However, the majority fails to address the lack of discourse and evidence regarding the admissibility of and, therefore, the need for the discovery of the metadata from the sundry computers.

¶ 82        Defendants claim that, because plaintiff operates computers, and computers have metadata that records how the computers are operated, the metadata can somehow be correlated to establish the existence or nonexistence of *any* change to plaintiff's brain by determining how plaintiff's brain was operating the computers. There is virtually no evidence in the record to support this "expert" supposition. I say "expert" because it is beyond the ken of a reasonable juror. See generally *Binge v. J.J. Borders Construction Co.*, 95 Ill. App. 3d 238 (1981).

¶ 83        Defendants relate that a computer expert or experts will have to be consulted to extract and interpret the metadata. The trial court took it on faith that it could be done. Extracting the information is one thing; interpreting it in the manner suggested is another.

¶ 84        The injuries that are contested relate to brain trauma and the effects thereof. I would submit that computer experts do not normally have expertise in the diagnosis and prognosis

of brain damage, let alone damage allegedly caused by the impact of a rear-end collision. Thus, it seems appropriate that a medical expert who has been certified in the area of diagnosis and prognosis of traumatic brain damage (rather than a computer expert) would be required to opine within a reasonable degree of medical or scientific certainty whether plaintiff has experienced brain damage. And, if so, its nature and extent.

¶ 85 The problem with defendants' argument is that they do not cite any authority that suggests or implies that the collection and interpretation of metadata relating to the operation of a computer is an acceptable procedure for the diagnosis of the computer operator's possible brain damage, regardless of the type of expert involved. As stated by our supreme court:

"Under the rule of *Frye*, scientific evidence is admissible at trial only 'if the methodology or scientific principle upon which the opinion is based is "sufficiently established to have gained general acceptance in the particular field in which it belongs." ' *In re Commitment of Simons*, 213 Ill. 2d 523, 529-30 (2004), quoting *Frye*, 293 F. at 1014. Further, the *Frye* test is necessary only if the scientific principle, technique or test offered by the expert to support his or her conclusion is 'new' or 'novel.' [Citation.]" *People v. McKown*, 236 Ill. 2d 278, 282-83 (2010).

¶ 86 I am not aware of any authority that suggests that there is a certifiable correlation between any particular computer's metadata and the ability to diagnose brain damage, let alone traumatic brain damage. Therefore, I conclude that the tests and techniques that defendants have proposed to base discovery upon are new and novel and subject to the *Frye* test. If there is evidence to satisfy the *Frye* test, I submit that it should be presented along with any other evidence that would validate this discovery request.

¶ 87 I am not prejudging the outcome. I am merely determining that this record presents an instance that requires a *Frye* hearing. If this fails the *Frye* test then there is no reason for allowing discovery for inadmissible evidence based upon an unproven, unacceptable correlation between a computer's metadata and the alleged brain damage of its operator.