2025 IL App (4th) 241307

NO. 4-24-1307

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 19, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| MELODY MOTE, Individually and as | ) | Appeal from the |
| Independent Administrator for the Estate of | ) | Circuit Court of |
| Ashlee M. Silvia, Deceased; JIM MOTE, | ) | Rock Island County |
| Individually; and MICHAEL SILVIA, as | ) | No. 20L109 |
| Father and Next Friend of J.S. and M.S., | ) | |
| Minors, | ) | |
|       Plaintiffs-Appellees, | ) | |
| | ) | |
|       v. | ) | |
| | ) | |
| THE ESTATE OF MICHAEL J. McMANUS, | ) | |
| Deceased; MATTHEW J. STERN SR.; LLOYD'S | ) | Honorable |
| LONGBRANCH; CHUCKS'S TAP; and DAHL FORD | ) | Jeffrey S. McKinley, |
| DAVENPORT, INC., | ) | Judge Presiding. |
|       Defendants | ) | |
| | ) | |
| (Matthew J. Stern Sr., Defendant-Appellant). | ) | |
| | ) | |

JUSTICE GRISCHOW delivered the judgment of the court, with opinion.
Justices Knecht and DeArmond concurred in the judgment and opinion.

**OPINION**

¶ 1     This interlocutory appeal pursuant to Illinois Supreme Court Rule 304(b)(5) (eff.
Mar. 8, 2016) stems from the trial court's imposition of sanctions against defendant, Matthew J.
Stern Sr., for disregarding the court's order and failing to produce a cell phone for a forensic
examination. This discovery dispute has been contested since plaintiffs initiated discovery in
August 2021. After Stern failed to comply with the court's order, plaintiffs filed a petition for rule
to show cause and a motion for sanctions. The court granted both. Stern appeals, arguing various

grounds on which the discovery order and sanctions order must be reversed. We disagree and affirm.

¶ 2                                    I. BACKGROUND

¶ 3          On September 30, 2019, Michael J. McManus was driving a 2018 Ford Mustang GT, which Stern had loaned to him. McManus's girlfriend, Ashlee M. Silvia, was a passenger in the vehicle, and both were intoxicated. Toxicology reports showed McManus had a blood alcohol concentration of 0.109g/100ml. Snapchat videos recovered from Ashlee's account helped the traffic crash reconstructionist from the Rock Island County Sheriff's Office to determine McManus lost control of the vehicle and swerved across the center line, and the car entered the ditch, struck a culvert, became airborne, cleared a fence, landed, and burst into flames, killing both of them. The reconstructionist was able to determine the vehicle was traveling between 95 and 118 miles per hour before impact and that speed was a major contributing factor, as was alcohol.

¶ 4          Prior to filing the lawsuit, plaintiffs, Melody Mote, Jim Mote, and Michael Silvia, sent a preservation letter to Stern, demanding the preservation of all evidence relating to claims in this matter. The second amended complaint, filed on February 19, 2021, the operative pleading before the trial court and on appeal, alleges negligent entrustment/wrongful death (count III) (740 ILCS 180/1 (West 2020)) and negligent entrustment/survival action (count IV) (755 ILCS 5/27-6 (West 2020)) against Stern in connection with Ashlee's death.

¶ 5                                    A. Discovery

¶ 6          Discovery in the form of a request for production to Stern was propounded by plaintiffs on August 9, 2021. Plaintiffs requested "[t]rue and correct copies of any and all text messages, emails, Facebook messages, social media messaging, social media posts, call logs or any other forms of electronic communication or social media interaction between MATTHEW J.

STERN and MICHAEL J. McMANUS." On October 5, 2021, Stern responded and provided pages from McManus's, Ashlee's, and Michael Silvia's Facebook accounts. The sworn answers attested there were no communications at all between Stern and McManus. On November 12, 2021, plaintiffs' counsel, Andrew Mahoney, sent a letter noting Stern's response did not include any communications between Stern and McManus. Mahoney found it "incredibly unlikely" Stern and McManus had not communicated and demanded Stern's compliance with this request. On December 2, 2021, Stern's counsel replied, stating all responsive communications had been produced.

¶ 7          Stern participated in a discovery deposition on May 24, 2022. Stern described McManus as one of his "best friends," with whom he would have contact at least every other day, including through meetings at restaurants and bars. Stern stated he "[p]robably" still had text messages from McManus on his cell phone and agreed not to delete them. On May 26, 2022, Stern's counsel produced texts between Stern and McManus. However, the texts only spanned the period between September 20, 2018, and December 1, 2018, some nine months before the fatal crash. The produced communications included a Facebook post made by McManus, which exposed a December 16, 2022, text chain between Stern and McManus. These texts were not produced. The text chain showed Stern badgering McManus about going to Chuck's Tap, a local bar (and a defendant in the underlying action), at 6:30 in the morning, a mere two weeks after the time frame of the limited texts already produced. Counsel asked Stern to meet to confer and inquired about the production of the other texts after December 1, 2018. Stern had no response, did not deny the existence of additional texts, and told counsel to file their motion.

¶ 8          Amy Camargo, a mutual friend of Stern and McManus, was deposed on March 14, 2023. Camargo testified that McManus and Stern met nearly every day for three years and their

meetings included drinking. According to Camargo, Stern and McManus "were more than likely always intoxicated." Camargo often witnessed McManus texting with Stern about going to bars, and Stern would tell her about frequently being invited to bars. McManus was "famous" for drinking and driving, which Stern would have been aware of due to their frequent drinking together. Camargo knew Stern would purchase cocaine for McManus and supply money to him to do so. One evening, Camargo witnessed Stern buying $1,500 worth of cocaine. Stern and McManus were "heavy cocaine users," and Camargo saw them using cocaine almost "every time [they] hung out."

¶ 9    B. Attempts for a Forensic Examination of Cell Phone and Motion to Compel

¶ 10    On April 24, 2023, Mahoney sent a letter to Stern's counsel proposing a protocol for the inspection of Stern's cell phone and the acquisition of pertinent communications between him and McManus through 4Discovery, a digital forensic examination organization, now known as Crowe LLP (Crowe). Pursuant to this protocol, Crowe would "image" (the process of collecting and copying data) Stern's cell phone at plaintiffs' expense. Mahoney was willing to stipulate to the entry of a protective order permitting Crowe to produce only those communications responsive to plaintiffs' discovery request. Stern's counsel refused plaintiffs' request, claiming all responsive communications had been produced.

¶ 11    On June 8, 2023, plaintiffs filed a "Motion to Compel Pursuant to [Illinois] Supreme Court Rule 201(k) [(eff. Mar. 17, 2023)]." Plaintiffs requested a court order for Stern's cell phone to undergo a forensic examination to produce text messages between Stern and McManus. In support, plaintiffs argued the messages were relevant to their claim of negligent entrustment, the request was proportional as the burden of production was minimal in that they were only seeking communications between Stern and McManus, and Stern's cell phone was the

- 4 -

only device on which these messages were stored since McManus's cell phone was destroyed in the accident. The selected extraction method was the most nonintrusive way to obtain the communications. Plaintiffs emphasized Stern caused this situation due to his "misrepresentations in discovery and his refusal to produce" the requested messages.

¶ 12 On November 7, 2023, the trial court conducted its initial hearing on plaintiffs' motion to compel, though no report of proceedings appears in the record. The next day, Mahoney e-mailed Stern's counsel, now Jim Zmuda, suggesting a conference call, "given the court's position yesterday," to discuss concerns over the "protection of data" if Stern's cell phone was to be forensically examined. Zmuda was reminded of the need for Stern "not to delete anything."

¶ 13 On November 15, 2023, Zmuda informed Mahoney that Stern's in-house business information technology (IT) company, Computer Revolutions, could conduct a search of Stern's "iCloud information" for the requested communications. However, Stern had "changed phones" since September 30, 2019, which could potentially affect the search results according to Computer Revolutions. Mahoney responded it was "obviously unacceptable" for a company with a business connection to Stern to conduct the forensic examination and emphasized such an examination must be conducted by a neutral third party. Furthermore, Zmuda acknowledged Computer Revolutions does not conduct forensic analyses.

¶ 14 A month later, Mahoney and Zmuda communicated via e-mail with Richard, an employee at Crowe, regarding the forensic examination process. On December 18, 2023, having not received Zmuda's decision as to whether he was amenable to Crowe examining Stern's cell phone, Mahoney said he would seek a ruling from the trial court on the motion to compel.

¶ 15                    C. Hearing on Plaintiffs' Motion to Compel

¶ 16          The trial court held another hearing on the motion to compel on December 20, 2023. Zmuda told the court he had additional information relevant to the motion. Mahoney responded he "ha[d] no idea what this is." Zmuda responded that "this came together at the last minute literally."

¶ 17          Zmuda had communicated with Mahoney about Computer Revolutions conducting the forensic examination but "that was not acceptable to Mr. Mahoney." Zmuda recently learned the cell phone was owned by Stern Beverage (Stern is the president of the company). Zmuda provided the trial court with a letter from a staff member at Computer Revolutions who examined the cell phone and found data, specifically text messages, which Zmuda determined to be "irrelevant to the issues in this case" and to contain "sensitive information." Zmuda stated he and Stern were willing to submit the obtained information to the court for an *in camera* inspection to determine if any of that information was relevant. An IT person at Stern Beverage reviewed Stern's e-mail account to find any e-mail communications between him and McManus. Zmuda received "93 pages" of such communications, but only one or two e-mails were relevant. Zmuda was "happy" to review and produce "what [he] believe[d]" was relevant.

¶ 18          Mahoney had already informed Zmuda he was not amenable to having Computer Revolutions perform the forensic examination. Mahoney stated Zmuda had "evidence that they were misleading us about what communications and text messages there are," and his clear commissions of discovery misconduct were "absolutely outrageous." Mahoney stated his recent conversation with Zmuda regarding the protocol for the forensic examination and protecting privileged communications was a waste of time. Mahoney requested the trial court "order the forensic production of the phone" and stated, "[N]one of this is acceptable. This is all ambush."

¶ 19          Zmuda claimed the proposed forensic examination of Stern's cell phone was "the

most intrusive method known to man" to obtain the requested communications. The trial court expressed its concern about the adequacy of the initial disclosures of pertinent communications. The court gave Stern "the benefit of the doubt," but it acknowledged that throughout the discovery process, new information "has come out in dribs and drabs," and the question remained, "[I]s there more?"

¶ 20    The trial court noted Mahoney's proposed examination method entailed "sensible precautions and protocols," which could protect Stern's "sensitive and personal information" immaterial to the underlying issues. When the court pressed Zmuda about why the newly disseminated communications were not part of the previous discovery disclosures, Zmuda did not know. Mahoney described Zmuda's "attitude" toward his discovery obligations as, "[W]ell, they have enough so why should we give them anymore [*sic*]." Mahoney had no objection to the court's proposed *in camera* inspection. The court acknowledged Zmuda's privacy concerns but noted ways to narrow the examination and make any objections before disclosure. The court gave Zmuda 14 days to propose an alternative forensic examiner. The parties could "reconvene" in the event there was no agreement on the examiner, but then Crowe would be "the default."

¶ 21    D. Communications Between McManus and Zmuda

¶ 22    On January 2, 2024, Zmuda filed his "Report of Matthew J. Stern, Sr. Regarding Production of Recently Obtained Text Messages and Emails." As he had done at the December 20, 2023, hearing, Zmuda represented he had Computer Revolutions review Stern's cell phone and e-mail account for text messages and e-mails between Stern and McManus. Zmuda included a log of the communications. This log contained dates and general descriptions of the communications and objections classifying the documents as either privileged, irrelevant, sensitive, or confidential.

¶ 23    On January 4, 2024, Mahoney sent a letter to Zmuda, expressing concerns over

"several serious issues" pertaining to Zmuda's disclosures. Mahoney stated he could not "count the number of times Mr. Stern, or yourself, have made statements to the trial court, whether through Stern's affidavit, motions, or otherwise, that there were no other text messages from Mr. McManus," yet the log filed on January 2 disclosed the existence of multiple communications. The log confirmed Stern had been engaging in discovery misconduct all along. The fact the recently disclosed communications were directly responsive to the discovery requests reflected sanctionable conduct. Mahoney also took issue with the objections, noting, "The 'objection' of 'sensitive' *** is not recognized by any court anywhere in the United States." Mahoney stated, "The fact that there are communications here that are directly responsive to our discovery request and are still being held is the definition of sanctionable conduct." Mahoney stated he would notify Brosemer to ship the hard drive to Stern for the forensic examination unless Zmuda informed Mahoney differently "immediately." Zmuda replied the same day, claiming Mahoney had "no evidence" to support the accusation of discovery misconduct and objected to Mahoney's "fishing exercise." Zmuda outlined Stern's and Stern Beverage's agreement for the forensic examination of the cell phone.

¶ 24          E. January 18, 2024, Motion to Compel Hearing and Trial Court's Order

¶ 25          The trial court conducted another hearing on plaintiffs' motion to compel, focusing on the forensic examination of Stern's cell phone. Mahoney stated personnel at Crowe would not permit representatives from Computer Revolutions to monitor the examination at its facility. Zmuda would not agree to Mahoney's request for communications spanning a five-year period. The court expressed concern over potentially accessing otherwise privileged communications and wanted to ensure appropriate safeguards were in place. Mahoney emphasized Crowe was the only company he was aware of that would ship a hard drive to someone so the forensic examination of

the cell phone could be conducted at home.

¶ 26        Stern's attorney objected to providing "a complete copy of Mr. Stern's cellphone" as "beyond any reasonable scope of discovery." Counsel argued it was an unreasonable burden and a violation of Stern's privacy to compel an examination by a third party. The trial court noted counsel had previously represented the cell phone did not contain responsive documents, yet "now there is something. It does at least raise the question is there more." Counsel reiterated their objection to any sort of forensic examination outside of their parameters. Mahoney noted Stern was given 14 days to find an alternative examining organization but "did nothing."

¶ 27        The trial court concluded it was not going to deny the motion to compel, but agreed five years was too long. The court determined communications from a year prior to the purchase of the car would suffice and the forensic examination should be "as tailored, as tight as possible." Counsel stated Stern was "not willing to comply" with this examination and requested a "friendly contempt finding" with a $100 fine so he could appeal the decision. On February 16, 2024, the court granted plaintiffs' motion to compel, entering plaintiffs' proposed order. Pursuant to the court's order, Stern was required, within 14 days, to permit the forensic examination of his cell phone by Crowe for the acquisition of communications between himself and McManus spanning the period between August 14, 2018, and September 30, 2019, and limited to those communications containing the terms "Michael," "McManus," and "Mike," McManus's cell phone number, and McManus's e-mail address. The order provided the data could be collected through Crowe's "Remote Collection Protocol" or Stern could bring the cell phone in person to a Crowe facility. The court permitted Stern to "have any representatives present for the collection of the data provided they do not interfere with the collection itself" but not to have any representative present during the "analysis" of such data at Crowe's secure lab. A protective order

was entered regarding the data gained from Stern's cell phone.

¶ 28 On February 19, 2024, Mahoney e-mailed Brosemer, inquiring about the next steps to proceed with the court-ordered forensic examination. Brosemer responded that day, requesting information from Stern's counsel. Having not received a response, on February 21, 2024, Brosemer sent another e-mail to Stern's counsel, who never responded.

¶ 29 On February 27, 2024, in response to plaintiffs' supplemental report filed with the trial court, the court e-mailed the parties, offering Stern an opportunity to be heard again as to the parameters and search terms for pertinent communications. Both attorneys agreed another opportunity to be heard was not necessary and left it up to the court whether to modify the previously entered order. On March 1, 2024, the court responded, indicating the search terms were not unduly burdensome, and left the order in place.

¶ 30 F. Plaintiffs' Petition for Rule to Show Cause and Court's Order

¶ 31 On March 8, 2024, Mahoney filed a petition for rule to show cause pursuant to Illinois Supreme Court Rule 201 (eff. Mar. 17, 2023) and Rule 219 (eff. July 1, 2002), asking for Stern to be held in direct civil contempt for failing to produce the requested communications by March 1, 2024. Mahoney requested payment of plaintiffs' attorney fees and costs and a jury instruction for a negative inference for Stern's willful failure to produce responsive communications. The petition outlined the three-year discovery dispute that started in 2021. Mahoney emphasized the "misconduct heaped upon misconduct" and complained of Zmuda's "repeated and habitual disregard for the rules of discovery."

¶ 32 On May 10, 2024, Zmuda responded by requesting the petition be denied, as the examination was overly broad, unduly burdensome, and invasive, with the possibility of extracting private information (despite a protective order being in place). Alternatively, Zmuda requested an

order of "friendly" indirect civil contempt so an interlocutory appeal could be filed.

¶ 33     On May 21, 2024, the trial court conducted a hearing and granted plaintiffs' petition for rule to show cause. In the order entered on May 24, 2024, the court found Stern in contempt of court for failure to comply with the February 16, 2024, order compelling a forensic examination of his cell phone, denied Stern's request for a finding of friendly contempt, and ordered the production of certain delineated documents for an *in camera* inspection. The issue of sanctions was set for a future hearing.

¶ 34          G. The Trial Court's Order on Plaintiffs' Motion for Sanctions

¶ 35     On September 24, 2024, the trial court granted plaintiffs' motion for sanctions. The court noted Stern had not acted in good faith in disclosing relevant information. Despite the court ordering Stern to comply with the forensic examination, he refused to do so. The court was cognizant of the sensitive and personal information that might be on Stern's cell phone, which is why the additional safeguards were put in place with the protective order. The court reiterated its belief these measures constituted "sufficient and reasonable safeguards" against plaintiffs obtaining "non-relevant, sensitive and personal information unrelated to the alleged facts in this case."

¶ 36     The trial court determined that sanctions in the form of both attorney fees and monetary penalties were appropriate in this case. The court required Mahoney to submit a statement detailing the fees incurred in connection with the motion to compel and petition for rule to show cause, and upon approval of the court, Stern would be required to pay those fees. Additionally, the court imposed a $100 daily fine, beginning October 15, 2024, which would increase by $50 per day after the expiration of every successive period of 15 days following October 15, 2024, "so long as Mr. Stern has not complied with the forensic examination of his cell

phone." (Thus, if Stern had not complied by October 30, 2024, the daily fine would increase to $150 until November 14, 2024, whereupon, if he still had not complied, it would increase to $200, and so on.) Stern could purge himself of the contempt finding and monetary penalty "by complying with the forensic examination process." The court reserved the issue regarding the giving of the negative inference jury instruction for a later date.

¶ 37        This appeal followed.

¶ 38                                II. ANALYSIS

¶ 39        On appeal, Stern first contends plaintiffs did not submit the appropriate subpoena for Stern Beverage, the professed owner of Stern's cell phone, to produce the cell phone for forensic examination. Stern argues the discovery order requires a forensic examination, which is "an unprecedented and disproportional, drastic discovery method, which would undoubtedly reveal an enormous amount of irrelevant, privileged and confidential information." Stern contends, "The asserted factual basis for the Discovery Order is insufficient as a matter of law to justify such an expansive intrusion upon [his] privacy." He argues the disproportionate nature of the discovery order is further demonstrated by plaintiffs' assertion they have " 'undisputed evidence' to support their claims against Stern for negligent entrustment," as additional information obtained through the forensic examination would not be more probative than that which they purportedly already have. Stern complains the discovery order is insufficiently protective of his "privileged information and attorney work product" in that the creation of a log reflecting such information would only occur after the forensic examination of the cell phone and exposure of all this data in the first place. Stern argues the discovery order amounts to "an unconstitutional invasion of privacy."

¶ 40        Stern reasons that even if this court decided to affirm the discovery order, it should

reverse the sanctions order because his contempt "was a good faith effort to have the Discovery Order reviewed" on appeal and the sanctions order is "legally impermissible under the circumstances." Finally, Stern maintains the trial court's "threat of a default judgment" and "threat of a negative inference jury instruction" were "improper."

¶ 41 In response, plaintiffs contend the ownership of the cell phone by Stern Beverage is "irrelevant," since the "key factor for production of discovery is custody and control, not ownership." Plaintiffs note the trial court limited the scope of the communications to be produced from the forensic examination of the cell phone to only those between Stern and McManus and only from within one year of the accident. Plaintiffs argue the discovery order was proportional in that the court entered a protective order ensuring both the need for the produced communications to be responsive to plaintiffs' discovery request and Stern to "have the opportunity to review the information and sign off on any production first," thereby satisfying constitutional concerns. Moreover, plaintiffs' discovery requests did not implicate the attorney-client privilege or work product doctrine, as they were tailored to texts between Stern and McManus, not between Stern and his counsel. As for the sanctions order, plaintiffs assert the court "carefully tailored" it to "obtain compliance with a lawful discovery order" and Stern's representation he was "acting in good faith by ignoring a lawful court order is not true." Finally, plaintiffs contend the court's purported "threats" of a default judgment and/or negative inference jury instruction are not appealable issues, as they did not constitute actual orders entered by the court that could properly be reviewed on appeal.

¶ 42 In reply, Stern argues his custody, possession, or control of the cell phone merely constitutes the "minimum threshold" for him to be compelled to produce the requested information. Stern again protests the "invasive" nature of the forensic examination ordered by the

trial court. Also, rather than having affirmatively committed " 'bad faith discovery conduct,' " which could justify the forensic examination, Stern merely "missed or could not find messages at first, but such messages were later identified and produced, pursuant to [his] duty to supplement his discovery responses." Stern asserts he justifiably requested a "friendly contempt finding" at the hearing on the motion to compel. Finally, Stern claims the court paid "little to no consideration" to the pertinent factors bearing upon the imposition of monetary sanctions.

¶ 43                    A. The Proper Standard of Review Is Abuse of Discretion

¶ 44            At the outset, this court must clarify the standard of review applicable to an appeal of a trial court's discovery order. Relying on *Klaine v. Southern Illinois Hospital Services*, 2016 IL 118217, ¶ 13, Stern contends this court must review the discovery order *de novo*. Plaintiffs, however, contend pretrial discovery orders are to be reviewed for an abuse of discretion. In reply, Stern, again relying on *Klaine*, reiterates his position that the discovery order is to be reviewed *de novo* because, here, "the material facts are uncontroverted."

¶ 45            The supreme court has observed that "[i]t is well settled that the correctness of a discovery order may be tested through contempt proceedings. Accordingly, when an individual appeals contempt sanctions for refusing to comply with a discovery order, the discovery order itself is subject to review." *Wisniewski v. Kownacki*, 221 Ill. 2d 453, 458 (2006). Stern reads too much into the passage of *Klaine* on which he relies for the proposition that the discovery order at issue is to be reviewed *de novo*. In *Klaine*, the supreme court stated that "although a trial court's order compelling discovery is ordinarily reviewed for a manifest abuse of discretion, the proper standard of review will depend on the question that was answered in the trial court." *Klaine*, 2016 IL 118217, ¶ 13. In that case, the defendant challenged a discovery order on the basis that the information requested was "subject to a statutory discovery privilege," raising an issue of

"statutory construction" and, thus, "purely a question of law." *Id.* The supreme court, therefore, reviewed *de novo* the determination of the trial court that "no statutory discovery privilege exists that would prevent the disclosure" of the documents at issue there. *Id.*

¶ 46    Here, as plaintiffs correctly point out, they are seeking communications between Stern and McManus and, therefore, *not* any information that could be protected from disclosure by the attorney-client privilege or work-product doctrine. As plaintiffs astutely observe, Stern is attempting to "make this a question of law and change the standard of review to *de novo*." However, the standard of review is abuse of discretion. This has been identified as "the most deferential standard of review recognized by the law," pursuant to which a decision will be reversed "only if the decision is unreasonable and arbitrary or where no reasonable person would take the view adopted by the [trial] court." (Internal quotation marks omitted.) *Pekin Insurance Co. v. St. Paul Lutheran Church*, 2016 IL App (4th) 150966, ¶ 69. The abuse-of-discretion standard is particularly appropriate for reviewing a trial court's discovery orders in that "[t]raditionally, the trial court is accorded great latitude in determining the scope of discovery as discovery presupposes a range of relevance and materiality which includes not only what is admissible at trial but also that which leads to what is admissible at trial." *Computer Teaching Corp. v. Courseware Applications, Inc.*, 199 Ill. App. 3d 154, 157 (1990).

¶ 47    B. Subpoenas Were Not Necessary for Stern's Cell Phone to Be Examined

¶ 48    This court agrees with plaintiffs that Stern purportedly not personally owning the cell phone at issue would not prohibit an order that it be produced for forensic examination. The cell phone is, practically speaking, Stern's personal possession. As has been identified throughout the hostile discovery process, Stern, using this cell phone, engaged in extensive personal, private communications, untethered from any professional context and including those referring to going

to a bar with McManus, who Stern identified in his discovery deposition as "a very close, very tight friend" and one of his "best friends." Likewise, in his discovery deposition, Stern testified he had "just one cell phone," and he used it for "all purposes," "business" and "personal." As plaintiffs argue, Stern "cannot use technical ownership of the phone to selectively produce what he wants to produce." It was not necessary for plaintiffs to satisfy Illinois Supreme Court Rule 204(a)(4) (eff. Mar. 17, 2023) by issuing a subpoena to Stern Beverage to produce the cell phone for the trial court to properly subject it to forensic examination. Accordingly, this court disagrees with Stern's contention the trial court "lacked authority as a matter of law to enter the Discovery Order as no proper discovery request was ever issued by the Plaintiffs."

¶ 49 We also note the appellate court has observed the discovery rules satisfy a party's potential constitutional concerns. See *Carlson v. Jerousek*, 2016 IL App (2d) 151248, ¶ 35 ("The civil discovery rules adopt two safeguards to ensure that the discovery of private information will be 'reasonable' (and hence constitutional): relevance and proportionality."); see also *Shamrock Chicago Corp. v. Wroblewski*, 2019 IL App (1st) 182354, ¶ 32 ("But where the pertinent discovery rule provides requirements of relevance and reasonableness and the parties have the benefit of judicial oversight, the rule also complies, by definition, with the fourth amendment and *** the privacy clause of the Illinois Constitution." (Internal quotation marks omitted.)).

¶ 50 1. *Relevance*

¶ 51 Pursuant to Illinois Supreme Court Rule 201(b)(1) (eff. Mar. 17, 2023), "a party may obtain by discovery full disclosure regarding any matter relevant to the subject matter involved in the pending action." "Relevant evidence means evidence having *any* tendency to make the existence of a fact in issue more or less probable." (Emphasis in original.) *Shamrock*, 2019 IL App (1st) 182354, ¶ 35. The appellate court has observed that while relevant information "is

defined broadly to encompass not only admissible information but also information calculated to lead to the discovery of admissible information [citation], this definition is not intended as an invitation to invent attenuated chains of possible relevancy." *Carlson*, 2016 IL App (2d) 151248, ¶ 37. In this case, plaintiffs are asserting claims of negligent entrustment against Stern. Such claims require a plaintiff to show the defendant gave either express or implied permission, knowing the defendant might use the dangerous instrumentality in a manner involving an unreasonable risk of harm. *Evans v. Shannon*, 201 Ill. 2d 424, 434 (2002). "The two primary considerations in a negligent-entrustment-of-a-vehicle analysis are as follows: (1) whether the owner of the vehicle entrusted it to an incompetent or unfit driver and (2) whether the incompetency was a proximate cause of the plaintiff's injury." *Northcutt v. Chapman*, 353 Ill. App. 3d 970, 974 (2004).

¶ 52        Here, plaintiffs allege that on and before the date of the accident, Stern "knew or should have known" the vehicle he purchased and lent to McManus, and which McManus was driving at the time, "was a high performance vehicle and that modifications had been made to [it] to increase its performance capabilities making [it] more dangerous to operate especially in the hands of a careless and reckless driver such as MCMANUS." See *id.* Plaintiffs allege McManus proximately caused the fatal collision by, *inter alia*, driving this vehicle while intoxicated, having consumed alcohol at establishments earlier in the day. Included in the messages from September 20, 2018, to December 1, 2018, Stern had disclosed messages reflecting discussions between himself and McManus about visiting a local bar. Additionally, Camargo, one of Stern's and McManus's mutual friends, testified Stern and McManus would meet "a lot," "daily" over "approximately three years," and "[d]rinking was the theme of the two of them." Camargo testified she witnessed McManus and Stern texting about going to bars, and Stern would tell her "pretty frequently" about being invited out to bars. Camargo also testified about how Stern and McManus

were "heavy cocaine users," witnessing the two of them using cocaine almost "every time [they] hung out" and even observing Stern purchase $1,500 worth of cocaine, explaining further that he both purchased cocaine for McManus and supplied money to him for such purchases.

¶ 53    These considerations bear upon, and are relevant to, Stern's potential knowledge of McManus being "an incompetent or unfit driver," and it is particularly likely the disclosure of their electronic communications could yield additional indications of Stern's knowledge thereof. See *id.* Therefore, the electronic communications between Stern and McManus obtained through the forensic examination of Stern's cell phone are relevant to the allegations in this case. As plaintiffs point out, Stern implicitly admits the relevance of these communications by arguing, under Illinois Rule of Evidence 403 (eff. Jan. 1, 2011), they would be "irrelevant as cumulative" given plaintiffs' assertion they have " 'undisputed evidence' " to support their claims against him, as Rule 403 operates to exclude evidence that is cumulative, "[a]lthough relevant."

¶ 54                                   2. *Proportionality*

¶ 55    "Proportionality imposes a second limitation on what is discoverable: even if it is relevant, information need not be produced if the benefits of producing it do not outweigh the burdens." *Carlson*, 2016 IL App (2d) 151248, ¶ 39. Pursuant to Rule 201(c)(3),

> "the [trial] court may determine whether the likely burden or
> expense of the proposed discovery, including electronically stored
> information, outweighs the likely benefit, taking into account the
> amount in controversy, the resources of the parties, the importance
> of the issues in the litigation, and the importance of the requested
> discovery in resolving the issues." Ill. S. Ct. R. 201(c)(3) (eff. Mar.
> 17, 2023).

"All of these factors must be considered to the extent that they are relevant to the circumstances of each case." *Carlson*, 2016 IL App (2d) 151248, ¶ 40. Additionally, courts should consider "the extent to which the discovery sought represents a substantial invasion of the privacy interests of the responding party." *Id.* ¶ 41.

¶ 56    The trial court's order requiring a forensic examination of Stern's cell phone was proportional. First, most generally construed, the benefit of obtaining this information outweighs the burdens entailed in providing it. Plaintiffs offered to pay the costs associated with the forensic examination. The factor of "the importance of the issues in the litigation" weighs strongly in favor of the proportionality of the discovery order. The fundamental issue in the litigation is whether Stern is liable for the death of Ashlee from the fatal crash caused by the reckless, impaired driving of a man to whom Stern lent a high-performance and allegedly dangerous vehicle, allegedly knowing, in part through electronic communications, of his considerable history of substance abuse and impaired driving. So, too, would the factor of "the importance of the requested discovery in resolving the issues," as the communications produced thus far suggest the existence of other texts, equally bearing upon Stern's knowledge of McManus's alleged incompetence or unfitness behind the wheel—one of the elements of Stern's potential liability for negligent entrustment. Finally, the court adequately considered "the extent to which the discovery sought represents a substantial invasion of the privacy interests of the responding party" (*id.*) by limiting the temporal span of the communications and entering a protective order. The order provided the communications would first be produced to Stern's counsel and then ultimately allowed the court to decide if the "challenged material is, in fact, entitled to protection."

¶ 57    This court concludes the trial court's discovery order as it pertains to requiring the forensic examination of Stern's cell phone, supplemented by a carefully tailored protective order,

adequately satisfied the necessary limitations of relevance and proportionality. See *id.* ¶ 35. The discovery order was not an abuse of discretion, as it was not "unreasonable and arbitrary or [one] where no reasonable person would take the view adopted by the [trial] court." (Internal quotation marks omitted.) *Pekin Insurance Co.*, 2016 IL App (4th) 150966, ¶ 69.

¶ 58        C. The Attorney-Client Privilege and Work Product Doctrine Are Not Implicated

¶ 59        Stern asserts "any and all privileged information contained on or connected to the cell phone will be exposed to a third party before [he] can properly assert his privilege claims." Additionally, "any work product produced by the examination would be revealed before Stern or Stern Beverage *** or their respective attorneys, could make a specific assertion of work product privilege." Plaintiffs disagree, reiterating they are only seeking communications between Stern and McManus, not Stern and his counsel.

¶ 60        Rule 201(b)(2), titled "Privilege and Work Product," provides, in pertinent part:

> "All matters that are privileged against disclosure on the trial,
> including privileged communications between a party or his agent
> and the attorney for the party, are privileged against disclosure
> through any discovery procedure. Material prepared by or for a party
> in preparation for trial is subject to discovery only if it does not
> contain or disclose the theories, mental impressions, or litigation
> plans of the party's attorney." Ill. S. Ct. R. 201(b)(2) (eff. Mar. 17,
> 2023).

¶ 61        Here, the discovery order only requires the disclosure to plaintiffs' counsel of communications between Stern and McManus, not Stern and his counsel. Even if protected information was uncovered during the examination, adequate safeguards were in place. The order

provided that Stern's counsel would first be able to review and assemble a privilege log outlining whether information was subject to protection. If necessary, the trial court could ultimately determine whether the information was in fact protected.

¶ 62        D. The Trial Court's Imposition of Sanctions Was Not an Abuse of Discretion

¶ 63        Stern argues this court should reverse the trial court's sanctions order, even if the discovery order is affirmed. Stern characterizes his noncompliance with the discovery order as a "good faith effort to obtain appellate review of [the] unprecedented and intrusive invasion of [his] privacy." Stern also contends the sanctions order improperly requires him to pay plaintiffs' attorney fees going back to their motion to compel rather than the petition for rule to show cause. Stern takes issue with the "drastic, progressive monetary sanctions" the court imposed, which "impermissibly punish[ ]" him, notwithstanding his "multiple requests for a friendly contempt finding," and could amount over a period of 12 months to over a quarter of a million dollars.

¶ 64        In response, plaintiffs argue Stern's contention of acting "in good faith" to appeal the discovery order could not "be further from the truth." Stern simply "did nothing" to comply with the order granting the motion to compel. Plaintiffs rhetorically ask, "[H]ow can one act in good faith by doing nothing?" Moreover, Stern did not properly request a "friendly contempt finding" until plaintiffs filed their petition for rule to show cause, "just short of three months after the Order to Compel was entered." Stern previously broached this, but only "before the Order to Compel was filed, which is procedurally nonsensical." Plaintiffs contend the trial court did not abuse its discretion in imposing monetary sanctions. Plaintiffs argue the sanctions properly reached back to the filing of the motion to compel "because that would not have been necessary had [Stern] not acted in bad faith." As for the purportedly "punitive" nature of the progressive monetary sanctions, plaintiffs submit Stern "cannot ignore a lawful court order or Illinois law on discovery

- 21 -

and then cry foul when consequences follow."

¶ 65    In reply, Stern argues he "actually *requested* a friendly contempt finding at the January 18, 2024, [motion to compel] hearing." Stern faults plaintiffs for "fail[ing] to address how an amount of 'over a quarter of a million dollars' is specifically proportional to [his] conduct in challenging the Court's Discovery Order." Finally, Stern claims the trial court paid "little to no consideration" to the pertinent factors bearing upon the imposition of the monetary sanctions against him.

¶ 66    As the supreme court has explained:

"Rule 219(c) authorizes a trial court to impose a sanction, including dismissal of the cause of action, upon any party who unreasonably refuses to comply with any provisions of this court's discovery rules or any order entered pursuant to these rules. [Citations.] The decision to impose a particular sanction under Rule 219(c) is within the discretion of the trial court and, thus, only a clear abuse of discretion justifies reversal." *Shimanovsky v. General Motors Corp.*, 181 Ill. 2d 112, 120 (1998).

¶ 67    Our supreme court long ago cautioned that "[o]ur discovery procedures are meaningless unless a violation entails a penalty proportionate to the gravity of the violation. Discovery for all parties will not be effective unless trial courts do not countenance violations, and unhesitatingly impose sanctions proportionate to the circumstances." *Buehler v. Whalen*, 70 Ill. 2d 51, 67 (1977). Along this line,

"[i]n determining whether the trial court abused its discretion, a reviewing court looks to the same factors that the trial court considers in deciding on

- 22 -

a constructive sanction: (1) surprise to the adverse party; (2) the prejudicial effect of the proffered evidence; (3) the nature of evidence being sought; (4) diligence of the adverse party in seeking discovery; (5) timeliness of the adverse party's objection to the testimony or evidence; and (6) the good faith of the party offering the evidence. [Citation.] Of these factors, no single factor controls and each situation presents a unique factual scenario that bears on the propriety of a particular sanction." *Locasto v. City of Chicago*, 2014 IL App (1st) 113576, ¶ 26.

Under these factors, the trial court's sanctions order was not an abuse of discretion, considering this discovery dispute has spanned over a three-year period and continues to this day.

¶ 68        The first factor, the "surprise to the adverse party," weighs in favor of affirming the trial court's sanctions. See *id.* As described above, Stern, on October 5, 2021, and in response to plaintiffs' requests for electronic communications between himself and McManus, initially provided unrelated, unresponsive communications. After plaintiffs expressed their view that it was "incredibly unlikely" no such responsive communications existed, particularly considering the Facebook post showing texts, Stern responded that all responsive communications had been disclosed. Then, at the hearing on plaintiffs' motion to compel, Zmuda abruptly informed the court he had "more information" and wanted to "present some things *** today relevant to" the motion. This turned out to be a letter from Stern's in-house IT company, indicating it independently searched Stern's cell phone for these communications (despite Zmuda acknowledging Computer Revolutions did not conduct forensic analyses and knowing Mahoney was not amenable to such an arrangement) and found 93 pages of such communications. Upon learning of this, Mahoney told the court about previous communications with Zmuda and how the search could be conducted

to accommodate concerns about the protection of the data. However, such communication "was all just a waste of time," as Zmuda's actions illustrated his intention to have Computer Revolutions perform the examination "anyway," despite Mahoney's objection. Mahoney, quite understandably, felt "ambush[ed]." In response to the court's inquiry why these newly disclosed communications were not part of the previous discovery disclosures, Zmuda merely said, "I don't know. I don't know." The conduct by Stern's counsel caused surprise to plaintiffs of a degree sufficiently serious to warrant the sanctions imposed.

¶ 69 The second and third factors, "the prejudicial effect of the proffered evidence" and "the nature of evidence being sought," weigh in favor of affirming the trial court's sanctions. *Id.* Given the nature of the negligent entrustment claim and the relevance of Stern's communications with McManus about visiting bars and drinking alcohol and evidence of Stern's knowledge of McManus's alleged incompetence and unfitness as a driver, Stern's failure to timely disclose the communications during discovery "is extremely prejudicial to Plaintiffs."

¶ 70 The fourth factor, the "diligence of the adverse party seeking discovery," weighs in favor of affirming the trial court's sanctions. *Id.* The record reflects that after initially requesting electronic communications between Stern and McManus and Stern responding with communications unresponsive to the request, plaintiffs (1) responded in writing once again requesting these communications; (2) proposed a protocol for the forensic examination of Stern's cell phone (and even offered to pay the associated expenses) when again they were told all responsive communications has been disclosed; and (3) filed the motion to compel, requesting a court order a forensic examination of Stern's cell phone. Indeed, at the May 21, 2024, hearing on plaintiffs' petition for rule to show cause, the court told Mahoney, "I don't know what happened for the three years before I got in, necessarily. But I mean it would appear to me that you have

been diligent since I've been here."

¶ 71 Likewise, the fifth factor, the "timeliness of the adverse party's objection to the testimony or evidence," weighs in favor of affirming the trial court's sanctions. *Id.* Despite knowing of the request for electronic communications between Stern and McManus, counsel never objected to the scope of the discovery request until the motion to compel was filed. The motion to compel was necessitated by Stern's failure (without registering an appropriate objection) to disclose the requested communications.

¶ 72 Finally, the sixth factor, "the good faith of the party offering the evidence," weighs in favor of affirming the trial court's sanctions. *Id.* Stern characterizes his noncompliance with the discovery order as a "good faith effort to obtain appellate review," noting specifically his "five *** requests" for a finding of "friendly contempt" to initiate an interlocutory appeal of the discovery order. However, the sheer number of times a litigant may request a finding of "friendly contempt" is irrelevant when the requests were not made in "good faith." Not only did Stern initially request this finding before the order on the motion to compel was entered, but the ensuing efforts to get this finding began nearly three months *after* the order was entered and in his response to plaintiffs' petition for rule to show cause. The efforts to obtain a finding of "friendly contempt" in these circumstances do not constitute "good faith" efforts to obtain interlocutory appellate review of the discovery order. See *Willeford v. Toys "R" Us-Delaware, Inc.*, 385 Ill. App. 3d 265, 277 (2008) (finding the defendants did not engage in a "good faith" challenge to a discovery ruling when they did not request a finding of "friendly contempt" until responding to the plaintiff's motion for sanctions in relation to discovery noncompliance). Stern simply refused to comply with the court's order granting the motion to compel giving him until March 1, 2024, to comply. The imposition of sanctions was not an abuse of discretion.

¶ 73                                    E. Nonappealable Issues

¶ 74            Finally, Stern argues the trial court "erred as a matter of law" by "never specifically den[ying] a default judgment" in the sanctions order and "improperly fail[ing] to explicitly reject the issuance of [a negative inference] jury instruction." However, the court did not issue a ruling either as to a potential default judgment or a negative inference jury instruction. In the sanctions order, the court did not even mention a default judgment and explicitly "reserve[d] the issue of the negative inference instruction for later determination." Thus, there are no rulings on these matters for this court to properly review. See *Village of Maywood v. Health*, *Inc.*, 104 Ill. App. 3d 948, 956 (1982) ("In the absence of a ruling here, we have nothing to review.").

¶ 75                                         F. Sanctions

¶ 76            As a final matter, appellate courts have the inherent authority to impose sanctions upon a party, their attorney, or both, if the court determines the appeal is frivolous, otherwise not taken in good faith, or taken "for an improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." Ill. S. Ct. R. 375(b) (eff. Feb. 1, 1994). Rule 375(b) provides appropriate sanctions "*may* include an order to pay to the other party or parties damages, the reasonable costs of the appeal or other action, and any other expenses necessarily incurred by the filing of the appeal or other action, including reasonable attorney fees." (Emphasis added.) *Id.* Such sanctions may be issued pursuant to a motion filed by one of the parties or, where appropriate, upon the reviewing court's own initiative. *Id.* When the "reviewing court initiates the sanction, it shall require the party or attorney, or both, to show cause why such a sanction should not be imposed before imposing the sanction." *Id.*

¶ 77            A frivolous appeal is one "not reasonably well grounded in fact and not warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing

law." *Id.* An appeal "will be deemed to have been taken or prosecuted for an improper purpose where the primary purpose of the appeal or other action is to delay, harass, or cause needless expense." *Id.* The imposition of Rule 375 sanctions is "left entirely to the discretion of the reviewing court." *Parkway Bank & Trust Co. v. Korzen*, 2013 IL App (1st) 130380, ¶ 87. In determining whether an appeal is frivolous, courts employ an objective standard; the appeal is considered frivolous if it would not have been brought in good faith by a "reasonable, prudent attorney." (Internal quotation marks omitted.) *Thompson v. Buncik*, 2011 IL App (2d) 100589, ¶ 21.

¶ 78                                    1. *Trial Court Sanctions*

¶ 79        The delay tactics employed by Stern and his counsel were unnecessary and undertaken for the sole purpose of continuing their refusal to produce Stern's cell phone, despite it being a reasonable discovery request safeguarded by a protective order, a procedure frequently utilized in complex cases. Although Stern seems exceptionally concerned about sensitive and personal information that may be stored on his cell phone, the protective order provides sufficient safeguards to address his concerns. The parameters imposed for the forensic examination of the cell phone were narrow and specifically tailored to protect any sensitive and personal information immaterial to the underlying issues. The steps for reviewing the extracted information were established to ensure that opposing counsel only obtained the relevant text messages responsive to the discovery request. Further safeguards were imposed to allow the trial court to review the search results through an *in camera* inspection; thereby ensuring that any concerns about irrelevant or private information and constitutional privacy rights would be protected. The trial court was more than patient and generous in its efforts to resolve the discovery dispute, allowing the attorneys more time than necessary to attempt resolve their differences.

¶ 80        The record reveals no valid justification for Stern's delay tactics and ultimate refusal to abide by the discovery order and allow a forensic analysis of his cell phone by an independent examiner during this three-year discovery dispute. Further, it is clear from the record Stern and his attorneys made no good faith effort to produce the cell phone for forensic examination and never intended to do so. Their efforts to bypass the discovery order by using Stern's own in-house IT company to search Stern's phone and voluntarily producing responsive communications (after previously attesting that none existed), were frivolous and in bad faith. The decision whether to impose sanctions for a party's failure to comply with the rules or orders of the court lies within the sound discretion of the trial court and will not be reversed absent an abuse of discretion. *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 110 (2004). We find no abuse and affirm the trial court's imposition of sanctions.

¶ 81                    2. *Appellate Court Sanctions*

¶ 82        As a result of Stern's and his counsel's delay tactics, significant time and resources have been wasted not only by the attorneys and trial court in this case, but also by the judges, law clerks, and the clerk's office of this court. We concluded that "the primary purpose of the appeal *** is to delay, harass, or cause needless expense." Ill. S. Ct. R. 375(b) (eff. Feb. 1, 1994). We, therefore, *sua sponte*, find appropriate sanctions against Stern and his attorneys to be an amount sufficient to cover the reasonable attorney fees of plaintiffs in this case. Further, we issued a rule to show cause why such sanctions should not be imposed on Stern and his attorneys, jointly and severally.

¶ 83        Stern and his attorneys had an opportunity to respond to the rule to show cause, which this court found insufficient and unpersuasive. After having been given an opportunity to

explain their actions, counsel continued to defend their improper conduct, which should not be tolerated by any court.

¶ 84    When selecting appropriate sanctions, this court should consider the degree of bad faith involved, whether sanctions could deter others from similar conduct, and the relative merits of the parties' positions. *Penn v. Gerig*, 334 Ill. App. 3d 345, 354 (2002). Litigants may not deploy the use of legal process frivolously or falsely as a weapon in a dispute. To determine whether sanctions are appropriate, "the court employs an objective standard of what was reasonable under the circumstances at the time the claims in question were made." (Internal quotation marks omitted.) *Durbin v. Durbin*, 2024 IL App (4th) 240795-U, ¶ 77.

¶ 85    After due consideration of the parties' responses to the rule to show cause, we continue to conclude this appeal was frivolous and not brought in good faith. Accordingly, we order Stern and his attorneys, jointly and severally, to pay appellees' attorney fees and costs for having to defend this frivolous appeal in the amount of $5,250.00. We further order defense counsel and Stern, make this payment on or before May 30, 2025.

¶ 86                                III. CONCLUSION

¶ 87    For the reasons stated, we affirm the trial court's judgment and impose sanctions against Stern and his attorneys, jointly and severally.

¶ 88    Affirmed.

*Mote v. Estate of McManus*, 2025 IL App (4th) 241307

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Rock Island County, No. 20-L-109; the Hon. Jeffrey S. McKinley, Judge, presiding. |
| **Attorneys for Appellant:** | James S. Zmuda and Keisha N. Douglas, of Califf & Harper, P.C., Moline, for appellant. |
| **Attorneys for Appellee:** | Edward J. Prill and Andrew L. Mahoney, of Crowley, Prill & Mahoney, of Burlington, Iowa, for appellees. |